## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

MONTREAL MAINE & ATLANTIC
RAILWAY, LTD.,

Foreign Applicant in Foreign Proceeding.

Case No. 15-20518

Chapter 15

### Objection to motion for entry of an order recognizing and enforcing the plan sanction order of the Québec Superior Court

### Introduction

Canadian Pacific Railway Company (CP) objects to the Canadian monitor's motion to recognize and enforce the July 13, 2015 plan-sanction order. The monitor bases that motion on the Québec Superior Court's approval of the Montréal, Maine & Atlantic Canada Co. (MMA Canada) June 8, 2015 plan of compromise and arrangement under the Companies' Creditors Arrangement Act (CCAA). CP has filed a motion for leave to appeal that approval. In the event that motion is granted the plan-sanction order will be stayed and supplanted by the decision of the appellate court in Canada.

CP's objection to the proposal has been consistent: although the railroad mourns the victims of the Lac Mégantic derailment, CP was not at fault and should be able to defend against and seek indemnification for derailment claims. Regrettably, the Québec court does not share that view. Based on an overwhelming desire to have victims of the tragedy compensated, the court sanctioned a plan that arbitrarily rewards settling parties while hamstringing CP. And now, the monitor seeks hurried recognition of the plan-sanction order before CP can appeal plan approval in Canada or the chapter 11 plan can be judicially considered in the U.S.

1

The relief sought does not constitute chapter 15 "appropriate relief" or warrant chapter 15 "additional assistance" because the plan fails to sufficiently protect CP's creditor rights and contravenes United States public policy. Principles of comity require denial of the monitor's motion or, alternatively, postponement until after this Court addresses confirmation of the U.S. plan of liquidation proposed by MMA Canada's parent corporation, Montreal, Maine & Atlantic Railway, Ltd. (MMA), and after the Canadian appellate court has had the opportunity to consider CP's appeal.

## Summary of argument

The Court should deny the monitor's motion for five compelling reasons.

First, the plan-sanction order should not be recognized and enforced because the plan depends upon nonconsensual third-party releases and injunctions that far exceed anything authorized by U.S. law. Those releases and injunctions unconstitutionally limit CP's (and other non-settling creditors') rights and do not constitute chapter 15 "appropriate relief" or justify chapter 15 "additional assistance." The sanction order precludes CP from both suing and defending against claims of numerous non-debtor entities, even to the point of depriving CP of the contractual right of indemnity and setoff. Yet that same order allows released parties to maintain actions against CP. Most troubling, some non-debtor claims have been assigned to the monitor of the very entity that has been criminally charged with causing the Lac Mégantic derailment: MMA Canada.

Second, the plan confers one-sided protection to settling non-debtor entities in derogation of CP's due process rights. Such machinations prevent this Court from granting comity. The settlement agreements that contractually bind all parties and form the foundation of the plan— even to the point of trumping disclosed plan provisions—have been deliberately kept from CP without more justification than the say so of the settlors. Incredibly the Québec court sanctioned

2

a plan that the creditors never saw.  Likewise, the specific connections of most settling parties with MMA Canada remain a complete mystery.  CP cannot tell whether a claim against the settling parties is tantamount to a claim against the debtor.  Even the amounts of individual contributions remain secret.  In short, neither CP nor this Court can gauge the fairness and reasonableness of the plan or the settlements.  This Court is being asked to determine that CP's creditor rights have been sufficiently protected based upon a blind leap of faith.

Third, the releases and injunctions are not grounded on any legally cognizable necessity to MMA Canada—which has sold all assets and will not rehabilitate—but instead they are solely for the convenience of private non-debtor third parties, who could readily enter into such agreements amongst themselves, but are instead improperly, and contrary to US public policy, utilizing the Canadian insolvency proceedings as means to deprive CP, as a non-settling party, of, among other things, its substantive rights to contractual indemnification and setoff against non-debtors, in the context of a proceeding which is not intended to reorganize the debtor at all and will, in fact, leave the debtor without any release even from the third parties who have "settled" with it.  No United States court should condone the extinguishment of solvent non-debtor, third party contractual obligations that have nothing to do with a debtor's reorganization. Such a result can and should be accomplished, privately among the third parties, or in the context of litigation in other forums such as the Canadian class action.  The excessive release and injunctive provisions render the plan-sanction order unenforceable and violate U.S. public policy.

Fourth, as a foreign railroad, MMA Canada is statutorily ineligible for chapter 15 recognition.  Thus, this Court lacks subject matter jurisdiction to hear this motion.

3

And fifth, because CP seeks to appeal the sanction order in Canada, domestic enforcement would be premature and could lead to absurd results. Besides that, recognition of a foreign plan-sanction order should not proceed before this Court's consideration of MMA's U.S. chapter 11 plan confirmation request. Therefore, this Court should deny the monitor's motion, or, in the alternative, stay the proceedings until after the fate of MMA Canada's parent's liquidation plan is decided and there is a final, non-appealable plan-sanction order.

## Background

The monitor seeks early enforcement of a plan sanction order that stretches the boundaries of Canadian law and tramples over United States law and public policy. Notably, in Canada, CP has sought to appeal the order that the monitor asks this Court to enforce. That request has not yet been decided, and the U.S. chapter 11 liquidation has yet to be heard.

Hence, the timing and goals of this motion are far from altruistic and represent an unseemly race to judgment. The early U.S. enforcement of the plan-sanction order would amount to a *de facto* confirmation of the MMA chapter 11 plan without the benefit of protections afforded by the confirmation process. MMA's chapter 11 plan cannot be confirmed, and MMA Canada's plan-sanction order should not be enforced as a proxy, particularly when it is still subject to appellate review in Canada.

### A.     Derailment and sale of MMA Canada's assets.

On July 6, 2013, MMA Canada's train of crude oil laden tank cars derailed in Lac-Mégantic, Québec, killing 47 residents and causing extensive property damage. The crude oil belonged to Western Petroleum Company, a subsidiary of World Fuel Services Corporation. MMA Canada owned the locomotive that powered the train and the tracks upon which the train derailed. On top of that, MMA Canada employed the engineer, who left the train on an incline without surveillance, and without proper pressure on the brakes. Shortly after the derailment, on

4

July 15, 2013, lawyers initiated a Québec class action against MMA Canada and other parties.

Shortly thereafter, on August 6, 2013, MMA Canada sought CCAA protection. A Canadian

court granted that application on August 8, 2013. On August 16, 2013, the parties joined CP in

the class action.

In September 2013, MMA Canada began selling assets. On January 23, 2014, the

Canadian court approved the sale of MMA Canada's business to Railroad Acquisition Holdings.

Buyer and seller closed the transaction in June 2014.

### B.   MMA Canada's plan of arrangement.

On March 31, 2015, MMA Canada filed a plan of arrangement with the Québec court.

The plan incorporated numerous third party settlement agreements with entities who contributed

to an indemnity fund that would be paid to derailment victims and others. The monitor filed the

settlement agreements under seal. On June 8, 2015, the monitor filed the amended plan of

compromise and arrangement, which the court approved on July 13, 2015. Section 2.1

announces plan purposes as follows:

**2.1 Purpose**

The purpose of the Plan is:

a) *to effect a full, final and irrevocable compromise, release, discharge, cancellation and bar of all Affected Claims against the Released Parties*;

b) to effect the distribution of the Funds for Distribution and payment of the Proven Claims, as set forth in Sections 4.2 and 4.3;

The Plan is put forward in the expectation that the Creditors, when considered as a whole, will derive a greater benefit from the implementation of the Plan than they would in the event of a bankruptcy of MMAC.

(Emphasis added).

Hence, the obvious primary plan objective is the settlement of creditors and victims'

claims against potentially liable third parties. The plan does not restructure MMA Canada. That

5

undertaking could never be accomplished: it sold all assets, will never again operate, and is not even obtaining a release or discharge.

In consideration for the non-debtor, third party contributions to the indemnity fund, plan section 5.1 affords broad releases along with injunctions prohibiting claims against the released parties, including the extinguishment of setoff and contractual indemnity rights as follows:

### 5.1 Plan Releases and Injunctions

All Affected Claims shall be fully, finally, absolutely, unconditionally, completely, irrevocably and forever compromised, remised, released, discharged, cancelled and barred on the Plan Implementation Date as against the Released Parties.

All Persons (regardless of whether or not such Persons are Creditors or Claimants) shall be permanently and forever barred, estopped, stayed and enjoined from

[…]

(vi) asserting any right of *setoff*, compensation, subrogation, contribution, *indemnity*, claim or action in warranty or forced intervention, recoupment or avoidance of any kind against any obligations due to the Released Parties with respect to any Claim or asserting any right of assignment of or subrogation against any obligation due by any of the Released Parties with respect to any Claim, […]

(Emphasis added).

Section 3.3 of the plan states that MMA Canada's insolvency renders claims against the debtor unlikely. The plan accordingly does not discharge MMA's Canada liabilities or restructure MMA Canada's balance sheet. Thus plan approval benefits settling third parties, but not MMA Canada.

Finally, the plan strips CP of substantive contractual rights unrelated to MMA Canada. Specifically, the plan extinguishes contractual indemnity duties that non-debtor, released parties took on and prohibits CP from proceeding against those released parties even though they can sue CP. For example, Western Petroleum Company (WPC) gave CP as the originating carrier,

6

shipping instructions. World Fuel Services Corporation (WFS), WPC's parent, sold the crude oil

that exploded in the derailment to Irving Oil. WPC and WFS contributed to the indemnity fund.

As a result, plan section 5.1(vi) releases WPC and WFS and enjoins claims against them. That

plan provision deprives CP of the contractual indemnity to which WPC agreed. Under Tariff 6,

Item 20, Private Equipment Terms, in effect at the time, WPC agreed to indemnify CP for any

fault or breach of the terms and conditions of the tariff, including, among other things, that such

equipment complied with all regulations and was otherwise in suitable condition for the safe rail

transportation of commodities.

At the same time, CP has already received a notice of claim from Irving Oil. In that

notice, Irving Oil reserves the right to recover the $75,000,000.00 CAD that Irving Oil

contributed to the indemnity fund. The notice also informs that Irving Oil assigned rights against

CP to the MMA Canada monitor. Hence, CP's fears about this unfair, one-sided pact are already

coming true: released parties may sue CP in accordance with the plan while the plan prevents CP

from instituting any actions (or even raising defenses or counterclaims) against parties

responsible for the derailment.

The plan does little more than grant complete and final releases to parties who are

potentially responsible for the consequences of the derailment but who contributed to the

indemnity fund. CP is not among the contributors and did not enter into a settlement agreement.

Importantly, the plan does not release CP. Accordingly this lopsided arrangement directly

affects CP's rights.

## C.     The plan approval appeal.

CP seeks to appeal the plan-sanction order because plan provisions go beyond what the

CCAA permits. The CCAA is designed to restructure debtors and to effect compromise of

debtor and creditor claims. The plan does neither. MMA Canada will not be restructured or

7

even liquidated; all assets have already been sold.  The proceeds of that sale did not cover amounts owed to secured creditors; therefore MMA could not make distributions to ordinary creditors.

As a result, the plan offers nothing to general creditors but rather pays creditors who made claims against third parties.  And the plan does not release MMA Canada.  Canadian law requires that a release in favor of a solvent third party must be reasonably connected to the restructuring of the insolvent debtor.  Because the Canadian plan does not propose a "compromise or arrangement" between the debtor and creditors within the meaning of the CCAA, approves releases that have nothing to do with MMA Canada's restructuring, and impermissibly extinguishes contractual rights between third parties, the plan sanction order should be overturned on appeal.

This motion does not seek to enforce foreign compromises between MMA Canada and creditors. Instead, the motion seeks to prematurely ram through an unsupportable agreement that would settle claims among derailment victims and potentially liable third parties.  The settlement of claims between non-debtors should be accomplished outside of any insolvency proceeding.

Argument

## I.    Chapter 15 comity.

Congress enacted chapter 15, entitled Ancillary and Other Cross-Border Cases, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  The legislation adopts the Model Law on Cross-Border Insolvency promulgated by the United Nations Commission on International Trade Law.  Chapter 15 replaced Bankruptcy Code section 304.

Chapter 15 provides for the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors ...." 11 U.S.C. § 1501(a)(3).  But a court should grant chapter 15 relief "only if the interest of the creditors ... are sufficiently protected." 11 U.S.C. §

8

1522(a).  Comity is not an "absolute obligation."  *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139 (1895).

Nothing in chapter 15 requires the enforcement of foreign plans of reorganization. Instead, comity should only be afforded within the parameters of Code.  "Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise." *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996).

The monitor seeks relief under sections 1521 and 1507.[1]  Section 1521 provides that "[u]pon recognition of a foreign proceeding … where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may grant appropriate relief." 11 U.S.C. § 1521(a).  Section 1507 provides that a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States." 11 U.S.C. § 1507.  But regardless of what the monitor wants, the Court cannot recognize and enforce a plan that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

In evaluating sections 1521 or 1507 requests, courts first consider section 1521.  *In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1056 (5th Cir. 2012).  The court can grant relief enumerated in sections 1521(a) and 1521(b), as qualified by the creditor protection demanded by section 1522(a). *Id.*  If the section does not list the requested remedy, the court determines whether relief is available under section 1521's grant of "any appropriate relief"—*i.e.* relief allowed by former section 304 of the Bankruptcy Code.  *Id.* at 1056-57.

---

[1] The monitor also seeks relief under the catchall provision of 11 U.S.C. § 105(a).  Section 105 is not, however, a means to end-run Bankruptcy Code requirements. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) ("whatever powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

7179495v9

"A court should also consider whether the requested relief would otherwise be available in the United States." *Id.* at 1057. Only when a request goes beyond the relief previously or currently allowable, should the court consider whether a remedy constitutes section 1507 "additional assistance." *Id.* Section 1522(a) restricts the relief allowed by section 1521 to remedies that protect the interests of creditors and other interested parties.

In considering section 1507 "additional assistance," the question is not whether Canadian law, in the abstract, provides appropriate procedures and priorities. Rather, courts must determine on a case-by-case basis whether the process used and result attained satisfies section 1507(b). *See, e.g.*, *In re Treco*, 240 F.3d 148, 156 (2d Cir. 2001) ("Although some of the considerations in determining whether to defer to a certain country's bankruptcy proceedings may be constant from case to case, other factors vary."); *Pan E. Exploration Co. v. Hufo Oils*, 798 F.2d 837, 839 (5th Cir. 1986) ("Comity is not a binding obligation, but a discretionary decision that deference will best promote the mutual interest of the United States and foreign sovereigns. Whether the mutual interest of both sovereigns are served by comity depends on the circumstances of each case.").

## A.    Section 1521 precludes the requested relief.

For several reasons, enforcing the plan-sanction order does not qualify for section 1521 "appropriate relief." To begin with, that section does not enumerate nonconsensual third-party releases or nonconsensual injunctions. *See* 11 U.S.C. § 1521 (listing available relief); *see also* *Vitro*, 701 F.3d at 1058. Instead, section 1521 primarily halts collection activities. And the non-enumerated aid that the monitor seeks cannot be characterized as "appropriate relief." Former section 304 did not sanction nonconsensual, non-debtor releases, and U.S. Bankruptcy law does not generally make such releases available.

10

Thus nonconsensual, non-debtor releases cannot be non-enumerated "appropriate relief" that the Code empowers the courts to grant.  11 U.S.C. § 524(e).  As the court in *Vitro* stated:

> Section 1521(a)'s general grant of 'any appropriate relief' also does not provide the necessary relief because our precedent has interpreted the Bankruptcy Code to foreclose such a release, and because when such relief has been granted, it has been granted under § 1507, not § 1521.

*Vitro*, 701 F.3d at 1058.

Importantly, section 1521 only provides relief "where necessary to effectuate the purpose of this chapter and to protect assets of the debtor or the interest of the creditors." 11 U.S.C. § 1521(a).  "The provisions of Chapter 15 make it clear that the court is to be guided in its decision making by the purpose of Chapter 15, which are set forth in section 1501(a)(1)-(5)."  *In re Lee*, 472 B.R. 156, 180 (Bankr. D. Mass. 2012).  Section 1501specifies chapter 15 purposes as the protection and maximization of a debtor's assets, (subsection (a)(4)) and the rescue of troubled businesses, (subsection (a)(5)).  Neither goal is served.  Instead, the plan protects the assets of third parties.

Chapter 15 defines the "debtor" as "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1).  MMA Canada is the only debtor before this Court; none of the non-debtor, third parties are the subject of the CCAA proceeding.  Yet the plan-sanction order purports to afford permanent injunctions that effect a discharge in favor of those non-debtor, third parties while leaving MMA Canada with no protection whatsoever.  Critically, the plan does not release the only debtor in those proceedings.  Thus the plan is antithetical to chapter 15's purposes: the debtor's assets (sold long ago) are not maximized; a troubled business (no future operations) is not rescued; and all creditors and interested parties (CP is stripped of rights) are not protected.

Besides flouting chapter 15 purposes, the plan promotes the protection of non-debtor, third parties.  Section 1521 does not allow for that result.  Like the rest of the Bankruptcy Code,

11

section 1521 focuses on protections for the debtor. Yet the plan provides no protection for MMA Canada or non-settling third parties, like CP.

Instead, CP interests are despoiled, in contravention of the Code requirement that "relief may be granted pursuant to section 1521 only if the interests of creditors and other interested entities are 'sufficiently protected.'" *In re Lee*, 472 B.R. at 175 (quoting 11 U.S.C. § 1522(a)). "Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, *without unduly favoring one group of creditors over another.*" *In re Tri–Cont'l Exch. Ltd.*, 349 B.R. 627, 637 (Bankr.S.D.Cal.2006) (emphasis added).

The relief afforded by the plan, which the monitor asks this Court to recognize and enforce, unquestionably favors certain creditors over others. CP is denied rights while others maintain theirs; some creditors receive large payouts while others receive none. Accordingly, section 1521 does not enable this Court to grant plan-sanction order recognition and enforcement.

**B.     Extreme and inappropriate third-party releases and injunctions prevent the plan from qualifying for section 1507 "additional assistance".**

The monitor's only other hope for relief would be section 1507, which permits courts to provide "additional assistance" to a foreign representative, subject to the limitations of chapter 15. 11 U.S.C. § 1507(a). Section 1507(b) calls upon the court to consider whether the additional assistance, consistent with principles of comity, will reasonably assure:

> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

12

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

These factors are "essentially elements of the grounds of granting comity," H.R. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 109 (2005), and therefore circumscribe judicial discretion. *See In re Treco,* (former section 304(c) (now section 1507(b)) "supplants the federal common law comity analysis" and "directs courts instead to use the statutory factors to balance the reasons for and against affording comity."). 240 F.3d at 158. Accordingly, Section 1507(b) factors "may form the basis for denying relief, and thus denying comity, in some cases." *Id.* at 157.

Section 1507(b)(2), for example, requires protection of claim holders in the United States. But the plan provides no protection to CP. CP claims against non-debtor entities are extinguished simply because those parties contributed to the settlement fund. As a result, CP cannot pursue any claim against the settling non-debtors even though those entities are solvent, are not the subject of the CCAA proceedings, and owe duties and have potential liability to CP.

In fact, some non-debtors have assigned claims against CP so as to provide MMA Canada with potential causes of action that that debtor would not otherwise possess. Since the plan deprives CP of rights against released non-debtors and subverts CP's CCAA claim, enforcement of the plan-sanction order would wreak prejudice. The MMA Canada debtor cannot satisfy section 1507(b)(2).

13

Section 1507(b)(4) specifies that "additional assistance" must reasonably assure "distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by [the Bankruptcy Code]."  In assessing this factor, the court looks beyond "macro [foreign] system concepts" and "consider the differences between American priority rules and those applicable to the foreign proceeding in determining whether affording comity will be repugnant to American policies." *In re Treco*, 240 F.3d at 158.

Section 1507(b)(4) requires "substantial" conformity with applicable U.S. law. The plan, however, seeks to distribute MMA Canada's assets based on the discharge of obligations owed by non-debtors. The respective amounts that the monitor pays to creditors apparently depend upon the discharge of non-debtor entities that contribute to the settlement fund.  Thus the releases, as opposed to an appropriate priority scheme, dictate how MMA Canada's property is distributed.

The Code only makes nonconsensual non-debtor releases available in extraordinary circumstances. *Vitro*, 701 F.3d at 1066.  Compliance with the CCAA is not enough. *See id.* ("The mere fact that the [foreign] proceeding complied with the relevant provisions of the [applicable foreign law] is not, in itself, sufficient.").  The enforcement of nonconsensual releases and injunctions must also comport with U.S. law and policies.  The plan does not.

The Bankruptcy Code limits the extent to which a non-debtor can be released in an insolvency proceeding: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e).  This provision "precludes bankruptcy courts from discharging the liabilities of non-debtors." *In re Fred Lowenschuss*, 67 F.3d 1394, 1401 (9th. Cir. 1995), *cert. denied*, 517 U.S. 1243 (1996).  The Code creates an exception to the rule

14

regarding no discharge of non-debtors for asbestos cases.  *See* 11 U.S.C. § 524(g).  Importantly,

Congress amended the Code to make  asbestos claims an exception.  Since no such exception is

available to the monitor, the plan violates section 524(e) by purporting to release non-debtor

tortfeasors and to enjoin non-debtor, third parties, like CP, from suing (while at the same time

preserving the released parties' rights against CP).  This type of non-consensual injunction

impermissibly discharges non-debtor liability.  Such a result violates section 524(e) by providing

no alternative means for creditors to enforce rights against non-debtors.  *See In re Zale Corp.*, 62

F.3d 746, 762 (5th Cir. 1995).[2]

Despite section 524's prohibition against third party releases, the Circuits have split on

the issue.  The Fifth, Ninth, and Tenth Circuits do not allow non-debtor releases.  *See In re Zale

Corp.,* 62 F.3d at 756; *In re Fred Lowenschuss*, 67 F.3d at 1401-02; *In re Western Real Estate

Fund Inc*., 922 F.2d 592, 601 (10th Cir. 1990).  In contrast, the Second, Third, Fourth, Sixth and

Seventh Circuits condone such releases in limited circumstances.  *See In re Drexel Burnham

Lambert Group Inc*., 960 F.2d 285, 292 (2d Cir. 1992); *In re Continental Airlines*, 203 F.3d 203,

214 (3d Cir. 2000); *In re A.H. Robins Co. Inc*., 880 F.2d 694, 700-02 (4th Cir. 1989); *In re Dow

Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002); *In re Specialty Equipment Cos*., 3 F.3d 1043,

1047 (7th Cir. 1993) (permitted only when creditors consent).  The First Circuit has yet to weigh

in on the subject.

### 1.       First Circuit.

Third party releases have twice been before the First Circuit—*In re G.S.F. Corp*., 938

F.2d 1467 (1st Cir. 1991) and *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir.

---

[2] As explained in greater detail below, besides failing to conform with section 1507, the extreme departure from section 524(e) also runs afoul of U.S. public policy and thus violates section 1506.

1995).  Neither case controls or endorses such releases, because the appellate court ducked the issue.

*G.S.F.* involved an injunction stemming from mutual releases that a debtor entered into with a secured party in order to settle an isolated environmental dispute.  As justification for the injunction, the bankruptcy court invoked equitable authority.  *See* 11 U.S.C. § 105(a).  On appeal, the First Circuit noted the limitation on section 105's grant of equitable power.  In order for the bankruptcy court to be empowered to enjoin, the debtor's estate must be affected.

Instead of analyzing that requirement, the court distinguished *G.S.F.* as follows:

> This case is somewhat extraordinary, however, as what is sought is a relitigation injunction. The justification for the injunction here is not effect on the debtor (although the presence of such an effect certainly strengthens the case for the injunction), but protection of a federal judgment. *See Toucey v. New York Life Ins. Co*., 314 U.S. 118, 144, 62 S.Ct. 139, 149, 86 L.Ed. 100 (1941) (Reed, J., dissenting); 17 Wright, Miller & Cooper, *Federal Practice and Procedure* Sec. 4226 (2d ed. 1988). A valid original judgment provides the federal court with the power to issue the relitigation injunction.

*G.S.F. Corp*., 938 F.2d at 1475.   Hence, *G.S.F.* condemns collateral attacks, rather than endorsing third party releases.

*Monarch*, another collateral attack case, involved a plan of reorganization that released a number of non-debtors, including attorneys. Post-confirmation, the debtor's wholly-owned subsidiary sued the debtor's counsel for malpractice.  The law firm argued, and the bankruptcy court agreed, that the subsidiary violated the confirmed plan injunction. On appeal the subsidiary maintained that the bankruptcy court lacked jurisdiction to enjoin the malpractice action. Avoiding that issue, the First Circuit ruled that the subsidiary's failure to appeal the confirmation order estopped the action.   Rather than deciding the propriety of the injunction, the court deferred as follows:

16

> Though there is conflicting authority on the `jurisdictional' reach of
> section 105(a), the confirmation order cited precedent for a broad-
> based `incidental' injunctive provision . . . We express no view on
> the soundness of the precedents cited in the confirmation order, nor
> on their applicability to the particular Plan proposed by Monarch
> Life.

*Monarch*, 65 F.3d at 983.

## 2.      Other jurisdictions.

In those jurisdictions that authorize third party releases, plan proponents still face an uphill battle. Allowing non-debtor releases is the exception, rather than the rule.  To confirm a plan of reorganization festooned with non-debtor releases, the debtor must demonstrate (1) unusual circumstances, and (2) non-debtor release fairness and necessity based upon judicially developed factors.  *See, e.g.*, *In re Transit Group, Inc*., 286 B.R. 811, 817 (Bankr. M.D. Fla. 2002).

*In re Master Mortgage Investment Fund, Inc.*, summarized the state of the law.[3]   168 B.R. 930, 934-937 (Bankr. W.D. Mo. 1994) (Koger, J.)  Finding a *per se* rule against third party releases to be unwarranted, the court, nevertheless, cautioned that such a release "is a rare thing, indeed, and only upon a showing of exceptional circumstances . . ." should such a release be countenanced.  *Id*. at 937.  As a prerequisite to third-party-release relief, courts usually consider the following:

> (1) There is an identity of interest between the debtor and the third
> party, usually an indemnity relationship, such that a suit against the
> nondebtor is, in essence, a suit against the debtor or will deplete
> assets of the estate.

> (2) The non-debtor has contributed substantial assets to the
> reorganization.

---

[3] *Monarch* cited *Master Mortgage*, and many courts weighing whether to approve third-party, non-debtor releases rely on that precedent.

(3) The injunction is essential to reorganization. Without the [sic] it, there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*Id*. at 935 (footnotes omitted).

Likewise, in *Lacy v. Dow Corning Corp. (In re Dow Corning Corp.)*, the debtor sought non-debtor releases for silicone breast implant claims. 280 F.3d 648 (6th Cir. 2002). In confirming the debtor's third-party-release plan, the Sixth Circuit cautioned that non-consensual, non-debtor releases are only appropriate in "unusual circumstances." *Id.* at 658.

*Dow Corning* delineated the "unusual circumstances" as follows:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

(2) The non-debtor has contributed substantial assets to the reorganization;

(3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;

(4) The impacted class, or classes, has overwhelmingly voted to accept the plan;

(5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

(6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and;

(7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.*

18

Hence, U.S. courts should only approve third-party releases when the debtor rehabilitates, when third-party indemnity claims threaten future debtor operations and cash flow, and when prospective going-concern value can be harnessed to pay creditors in full.  Such releases should not be approved in a chapter 11 liquidation as a mere expedient for resolving claims among non-debtor third parties, even if such releases secure additional money for the estate.  *See In re Optical Technologies, Inc.*, 216 B.R. 989 (Bankr. M.D. Fla. 1997) (Paskay, J.) (refusing to approve releases because plan called for total liquidation of debtor); *In re Swallen's, Inc*., 210 B.R. 123, 127 (Bankr. S.D. Ohio 1997) (same); *In re Regency Realty Associates*, 179 B.R. 717 (Bankr. M.D. Fla. 1995) (same).

### 3.    Cases enforcing foreign plan orders that include third-party releases are distinguishable.

The monitor embraces *Metcalfe* and *Sino-Forest* to justify enforcement of the plan-sanction order.  *See In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010); *In re Sino-Forest Corp.*, 501 B.R. 655 (Bankr. S.D.N.Y. 2013).  These cases are readily distinguishable.

Both *Metcalfe* and *Sino-Forest* were decided in a jurisdiction that, unlike this one, had already approved nonconsensual third-party releases: the Southern District of New York within the Second Circuit.  *See Sino-Forest*, 501 B.R. at 661 ("the law in the Second Circuit limits availability of third-party non-debtor releases; they are 'proper only in rare cases.'") (citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005)); *see also Metcalfe*, 421 B.R. at 695.  But as the Southern District acknowledged "a prior decision to defer to a particular foreign court in one case is not determinative in a different case." *In re Garcia Avila*, 296 B.R. 95 (Bankr. S.D.N.Y. 2003).  Unlike the Second Circuit, the First Circuit has not recognized

19

third-party releases, and the Bankruptcy Code provides no basis for approving the inclusion of
such arrangements in a plan of reorganization.

More importantly, the releases and injunctions approved in *Metcalfe* and *Sino-Forest*
arose in circumstances that were very different from those in this case.  The *Metcalfe* court noted
that even in the Second Circuit, "a third-party non-debtor release 'is proper only in rare cases.'"
*Metcalfe*, 421 B.R. at 694 (quoting *Metromedia*, 416 F.3d at 141).

> [A] nondebtor release is a device that lends itself to abuse.  By it, a nondebtor can
> shield itself from liability to third parties. In form, it is a release; in effect, it may
> operate as a bankruptcy discharge arranged without a filing and without the
> safeguards of the Code.   The potential for abuse is heightened when releases
> afford blanket immunity.

*Id.* at 694-95 (quoting *Metromedia*, 416 F.3d at 142).

The court went on to note that "[a] nondebtor release in a plan of organization should not
be approved absent the finding that truly unusual circumstances render the release terms
important to the success of the plan[.]"  *Id.* at 695 (quoting *Metromedia*, 416 F.3d at 143). The
releases in *Metcalfe* met this high standard because "[t]he Canadian Proceedings were the result
of near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the
global financial crisis."  *Id.* at 700.

Similarly, the *Sino-Forest* release involved truly unusual circumstances: the foreign case
emanated from a securities class action in which Ernst & Young, a non-debtor, participated in
order to provide final creditor relief.  501 B.R. at 659.  The *Sino-Forest* court observed that Ernst
& Young had "made substantial non-monetary concessions and contributions that further warrant
recognition and enforcement of the E & Y Settlement in the United States.  In particular, E & Y
also … released all claims, including indemnification claims, asserted against SFC and SFC's
subsidiaries, officers, and directors …." *Id.*   The "unencumbered participation of the SFC
subsidiaries is crucial to the restructuring and the Plan intended to facilitate the subsidiaries'

continued operations free from the claims and uncertainty associated with SFC." *Id.* (quotation marks omitted).

This case lacks the rehabilitative purpose that motivated the *Sino-Forest* and *Metcalfe* courts. MMA Canada, like MMA, has already sold assets and ceased operating. Because no future value would be protected by the plan, no extraordinary circumstances warrant the release of and injunctions in favor of non-debtor, third parties. And this case is certainly not a situation in which the inclusion of third-party releases saves an entire industry.

Notably, too, in *Metcalfe* and *Sino-Forest* the foreign order to be enforced did not stem from the insolvency proceedings of a foreign subsidiary of a debtor mired in U.S. bankruptcy proceedings. That fact is determinative: the recognition and enforcement of the sanction order could be a *de facto* confirmation of MMA's U.S. chapter 11 plan.

As *Metcalfe* and *Sino-Forest* explained, the court was not being asked to approve non-debtor releases and injunctions in U.S. proceedings, but was only being asked to approve domestic enforcement of "provisions included in the Canadian Orders, *even if those provisions could not be entered in a plenary chapter 11 case*." 421 B.R. at 696 (emphasis added). The mere enforcement of a foreign plan, and not approval the third party releases in a domestic plan, led the court to recognize the foreign arrangement.

In contrast, if the court been asked to enforce the Canadian orders under U.S. law, the result would have been different. The *Sino-Forest* court noted that the Second Circuit, following *Metcalfe,* held that the bankruptcy court in a plenary chapter 11 case lacks jurisdiction to approve third-party releases unless third-party claims would impair the *res* of the estate. 501 B.R. at 662 (citing *In re Johns-Mansville Corp.*, 600 F.3d 135, 153 & n.13 (2d Cir. 2010)). Because *Sino-Forest* was not being asked to enforce such releases and injunctions in a U.S. chapter 11 case, a

21

different standard could be applied; the question presented was whether the foreign process was procedurally fair and not in contravention of U.S. law and public policy. *Id.* at 662-63.

This Court would not be simply giving full faith and credit to a foreign order; instead the Court would, in effect, be giving the green-light to nearly identical provisions in the chapter 11 plan for MMA Canada's bankrupt U.S. parent. Enforcement of the Plan Sanction Order would be tantamount to approving a chapter 11 plan that cannot pass stateside muster. Simply put, *Sino-Forest* and *Metcalfe* are inapposite.

Lastly, both *Sino-Forest* and *Metcalfe* involved release provisions that had already been appealed, and the appellate court had issued orders before the foreign representative sought U.S. enforcement. *See Sino-Forest*, 501 B.R. at 663; *Metcalfe*, 421 B.R. at 692. This case lacks any such finality: CP has sought leave to appeal the plan-sanction order; the appellate court has yet to decide whether to grant that request.[4]

### C.      The scope of the releases and injunctions are contrary to U.S. public policy.

Besides the many other impediments, the plan-sanction order cannot be enforced because the non-consensual third-party releases and injunctions violate U.S. public policy. "[N]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Stated differently, "[t]he principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States." *In re Treco*, 240 F.3d 148, 157 (2d Cir. 2001). Section 1506 is an "integral limitation on a court's

---

[4] The *Sino-Forest* court also noted that no party objected to the requested relief. 501 B.R. at 666.

22

authority to grant comity to foreign courts and foreign proceedings." *In re Toft*, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011).

"[T]he obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act." *Overseas Inns v. United States*, 911 F.2d 1146, 1149 (5th Cir. 1990) (citing *Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 n.104 (D.C. Cir. 1984)). "It is a settled principle of comity that deference need not be given to foreign judgments in the face of significant countervailing public policy reasons." *Overseas Inns v. United States*, 685 F. Supp. 968, 972 (N.D. Tex. 1988), *aff'd* 911 F.2d 1146 (5th Cir. 1990); *see also In re Qimonda A.G.*, 462 B.R. 165, 185 (Bankr. E.D. Va. 2011) (denying cancellation of patent licenses as offensive to U.S. public policy promoting technological innovation); *in re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009) (denying recognition of a foreign proceeding because relief would contrive automatic-stay public policy).

Although comity is the focus of chapter 15, statutory considerations can nevertheless preclude granting relief requested by a foreign representative, especially when the foreign proceeding is at odds with a fundamental domestic public policy. In determining whether to apply the public policy exception, courts consider (i) whether the foreign proceeding was procedurally unfair and (ii) whether the application of foreign law or the recognition and enforcement of a foreign order "would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out … the most fundamental policies and purposes of those rights." *In re Quimonda AG Bankruptcy Litig.*, 433 B.R. 547, 569 (E.D. Va. 2010).

While a properly administered CCAA proceeding generally meets procedural fairness requirements, the terms of the sanction order go beyond U.S. bounds by impinging on CP's due

23

process rights and violating nonconsensual, non-debtor discharge public policy. U.S. bankruptcy law denies the discharge of obligations to entities that do not file for bankruptcy. Non-filing entities cannot use a third party's bankruptcy to purge liability. *See* 11 U.S.C. § 524(e) (the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.").

The Bankruptcy Code manifests the concept that only a debtor can be discharged: the bankruptcy court has jurisdiction over the debtor's entire estate, but typically does not have jurisdiction over non-debtor property; the Bankruptcy Code describes eligibility requirements for debtors, but not non-debtors; bankruptcy procedures scrutinize debtors, but not non-debtors; debtors must make extensive asset, liability and financial affairs disclosures, but non-debtors do not; and the Bankruptcy Code provides safeguards for and limitations on discharging debtor obligations, but not for non-debtors. If the court were to afford a non-consensual discharge to a non-debtor, that relief would necessarily be granted without bankruptcy procedural safeguards.

Section 524(e) prevents the debtor from including in a plan a non-consensual discharge of a non-debtor's independent obligations and liabilities. 11 U.S.C. § 524(e). The plan for which recognition and enforcement is sought is even more egregious because the debtor's creditors determine whether third parties receive a discharge of their separate liabilities even over the objection of those—i.e. CP—to which the obligations are owed. The incredible scope of the plan's releases and injunctions conflict with the fundamental policy of preserving non-debtor claims and defenses that are not directly implicated by the debtor's reorganization or liquidation.

Rather than simply releasing non-debtor settling parties from MMA Canada claims, the plan purports to afford releases from third-parties that never consented to such forgiveness. The

24

sanction order's transgressions upon CP's rights, without the receipt of compensation, conflicts with fundamental legal principles—namely the preservation of non-debtor rights vis-à-vis another non-debtor.   If this Court were to recognize and enforce the sanction order, CP's contractual—i.e. property—rights of indemnification and setoff would be non-consensually confiscated.

The plan releases and injunctions effectively discharge non-debtors and go so far as to release third-party indemnity claims and set off claims that CP has against various non-debtor entities, while at the same time preserving claims that those shielded entities could assert against CP.   United States law does not permit such overreaching.

Finally, and very importantly, the Canadian plan releases MMA Corporation and Earlston Associates, L.P. from derailment liability.   *See Plan of Compromise and Arrangement, Schedule A ¶ 12*.   As noted in MMA's amended disclosure statement, MMA Corporation was, as of December 31, 2012, the parent company of MMA and MMA Canada, and Earlston Associates, a holding company, held 71.4% of MMA Corporation.   *Amended Disclosure Statement*, at 19 (*corporate organization*, section III.b.*v.*).   The sweeping releases granted to MMA Corporation and Earlston Associates are akin to the *Vitro* equity holder releases found to violate public policy.   Given this similarity, *Vitro* should animate this Court's approach.

In sum, section 1506 prevents enforcement of a plan-sanction order that violates public policy.

## II.    Chapter 15 does not apply to MMA Canada.

The monitor's motion should also be denied because MMA Canada, as a foreign railroad, is ineligible for chapter 15 protections.   Chapter 15 is off limits to the entities listed in section 1501(c):

This chapter does not apply to—

25

> (1) a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b); ….

11 U.S.C. § 1501(c).

Section 109, in turn, provides:

> ### § 109. Who may be a debtor.
>
> …
>
> (b) A person may be a debtor under chapter 7 of this title only if such person is not—
>
> (1) a railroad; ….

11 U.S.C. § 109(b).

Based on this plain language, commentators have concluded that "[u]nder Chapter 15, … foreign railroads … are not permitted to pursue" such relief. Megan R. O'Flynn, *The Scorecard So Far: Emerging Issues In Cross-Border Insolvencies Under Chapter 15 Of The U.S. Bankruptcy Code*, 32 Nw. J. Int'l L. & Bus. 391, 398-99 (Winter 2012); *see also* 2 COLLIER ON BANKRUPTCY ¶ 11.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Chapter 15 is not available to (1) railroads, (2) domestic insurance companies and (3) certain domestic and foreign financial institutions such as banks, savings and loan associations and clearing associations…."); Hon. Samuel L. Bufford, *Tertiary and Other Excluded Foreign Proceedings Under Bankruptcy Code Chapter 15*, 83 Am. Bankr. L.J. 165, 172 (2009) ("Section 1501(c) narrows this group [of potential foreign proceedings covered by Chapter 15] by excluding … foreign railroads ….").

Chapter 15 differs from predecessor law (section 304), which applied to entities not qualifying as section 109 debtors. *See, e.g.*, *Agency for Deposit Insurance, Rehabilitation, Bankruptcy and Liquidation of Banks v Superintendent of Banks of the State of New York*, 310

26

B.R. 793 (S.D.N.Y. 2004). Aware of prior law, Congress enacted section 109 to exclude foreign railroads.

MMA Canada filed for CCAA protection as a railroad and continues to avail itself of that protection. As much as the monitor tries to parse the application of section 109, he cannot escape plain and unambiguous statutory language. MMA Canada therefore cannot take advantage of chapter 15 protection. The Court should assess MMA's status as a railroad at the time of the CCAA filing, not as MMA Canada has maneuvered to become.

**III.    Enforcement of the plan-sanction order would be premature.**

     **A.    CP seeks to appeal the plan-sanction order in Canada.**

CP has moved for leave to appeal the sanction order. The Québec Court of Appeal scheduled a hearing on that motion for September 9, 2015. If leave to appeal is granted, then the enforcement of the sanction order would be stayed pending the appeal. For that reason, enforcement of the order in the United States would be entirely premature and could lead to an absurd result.

For example, if the Canadian ruling is overturned on appeal, injunctions would need to be undone. Waiting until the Canadian proceeding has run its course would be consistent with decisions, such as *Metcalfe*, in which the foreign representative presented lower and appellate court final orders on the plan for which U.S. recognition and enforcement was sought. *See, e.g.*, 421 B.R. at 698 (the propriety of releases upheld on appeal before foreign debtor sought U.S. recognition and enforcement).

     **B.    Alternatively, relief should be stayed pending MMA's plan confirmation.**

If this Court does not deny the motion outright or stay a ruling pending the outcome of CP's Canadian appeal, any chapter 15 relief should nevertheless be stayed pending the confirmation of MMA's chapter 11 plan of reorganization. MMA Canada is a subsidiary of

27

MMA. The plan should not be enforced or given effect in the United States while the domestic

parent company's liquidation plan remains undetermined. The pendency of a domestic

bankruptcy proceeding is good reason to stay enforcement of the plan-sanction order. If that

order were enforced, the confirmation of MMA's chapter 11 plan would essentially be a *fait*

*accompli*. MMA's plan of liquidation should be judged and confirmed, or not confirmed, on the

merits, not by proxy.


Dated: August 13, 2015        **BRIGGS AND MORGAN, P.A.**

By: /s/ *John R. McDonald*
Timothy R. Thornton (pro hac vice)
John R. McDonald (pro hac vice)
2200 IDS Center
80 South 8th St.
Minneapolis, MN 55402
612.977.8400
jmcdonald@briggs.com

**And**

**PEARCE & DOW, LLC**

By:/s/ Joshua R. Dow
    Joshua R. Dow
Two Monument Square, Suite 901
PO Box 108
Portland, Maine 04112-0108
(207) 822-9900 (Tel)
(207) 822-9901 (Fax)

**ATTORNEYS FOR CANADIAN PACIFIC
RAILWAY COMPANY**

7179495v9