**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

|  |  |
|---|---|
| In re:<br><br>MONTREAL, MAINE & ATLANTIC CANADA CO.,<br><br><br>Foreign Applicant in Foreign Proceeding. | Chapter 15<br>Case No. 15-20518 |

**JOINDER AND MEMORANDUM OF LAW OF ROBERT J. KEACH, TRUSTEE, IN SUPPORT OF (A) VERIFIED PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND (B) MOTION FOR ENTRY OF AN ORDER RECOGNIZING AND ENFORCING THE PLAN SANCTION ORDER OF THE QUÉBEC SUPERIOR COURT; RESPONSE TO CANADIAN PACIFIC RAILWAY CO.'S OBJECTION; AND RESPONSE TO U.S. TRUSTEE'S MOTION TO CONTINUE**

Dated:  August 18, 2015

ROBERT J. KEACH,
CHAPTER 11 TRUSTEE OF MONTREAL
MAINE & ATLANTIC RAILWAY, LTD.

By his attorneys:

Robert J. Keach, Esq.
Michael A. Siedband, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street
P.O. Box 9729
Portland, ME 04104
Telephone: (207) 774-1200
Facsimile: (207) 774-1127
E-mail: rkeach@bernsteinshur.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................2

ARGUMENT ...........................................................................................................4

A.     MMA Canada is Eligible to be a Debtor Under Chapter 15 of the
Bankruptcy Code Because it was Not a Railroad at the Time of the
Chapter 15 Petition ................................................................................4

B.     This Court Should Grant Comity to the Orders of the Québec Court
and Enforce them in this Chapter 15 Case, Because the Provisions of
the Orders are Permitted Under Canadian Law and Are Not Barred by
the Public Policy Exception in Chapter 15 ...........................................6

     (i)  Comity Generally ...................................................................6

     (ii)  United States Courts Uniformly Recognize CCAA Cases
and Uniformly Enforce Canadian Plan Sanction Orders ...................13

     (iii) CCAA Orders Containing Third Party Releases and Injunctive
Relief Do Not Offend U.S. Public Policy ...........................................15

C.     The Relief Contained in this Sanction Order is Permitted Under U.S.
Law, and is not Manifestly Contrary to Public Policy of the
United States .......................................................................................18

D.     CP Lacks Standing to Object to the Petition or the Motion, and the
CP Objection is a Poorly Veiled Attempt to Collaterally Attack
the Québec Court's Orders and Transform the Bankruptcy Court
into a Court of Appeals for the Québec Court. ....................................26

     1.  CP Lacks Standing to Object to the Petition or the Motion.................27

     2.  The Sanction Order Preserved All of CP Defenses and Does
Not Prejudice CP In Any Way; Indeed, It Is Foursquared
With Applicable U.S. Law...................................................................30

     3.  CP's Argument that this Court Should Refrain from Enforcement
of the Sanction Order Because CP has Appealed the Sanction
Order in Canada Lacks Merit and is Contrary to All Case Law
on Point ..............................................................................................33

     4.  CP's Reliance on Vitro is Misplaced and Misleading .........................35

E.     CP's Counsel Should be Sanctioned Pursuant to 28 U.S.C. §1927 ......36

F.    The U.S. Trustee's Motion to Continue the Petition and Motion Until
Such Time as the Court can Rule on the Trustee's Plan is Unnecessary
and Should be Denied ............................................................................................39

CONCLUSION ..............................................................................................................39

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

MONTREAL, MAINE & ATLANTIC
CANADA CO.,

Foreign Applicant in Foreign Proceeding.

Chapter 15
Case No. 15-20518

**JOINDER AND MEMORANDUM OF LAW OF ROBERT J. KEACH, TRUSTEE,**
**IN SUPPORT OF (A) VERIFIED PETITION FOR RECOGNITION OF FOREIGN**
**PROCEEDING AND (B) MOTION FOR ENTRY OF AN ORDER RECOGNIZING AND**
**ENFORCING THE PLAN SANCTION ORDER OF THE QUÉBEC SUPERIOR COURT;**
**RESPONSE TO CANADIAN PACIFIC RAILWAY CO.'S OBJECTION; AND**
**RESPONSE TO U.S. TRUSTEE'S MOTION TO CONTINUE**

Robert J. Keach, the chapter 11 trustee (the "Trustee") of Montreal, Maine & Atlantic

Railway, Ltd. ("MMA") in its chapter 11 case (Case No. 13-10670), hereby joins – and submits

the within memorandum of law in support of – Richter Advisory Group Inc.'s (the "Monitor")

Verified Petition for Recognition of Foreign Proceeding and Related Relief [D.E. 2] (the

"Petition"), regarding the chapter 15 petition of the above-captioned foreign applicant ("MMA

Canada"), and the Monitor's Motion for Entry of an Order Recognizing and Enforcing the Plan

Sanction Order of the Québec Superior Court [D.E. 3] (the "Motion") seeking enforcement

within the United States, against persons and entities domiciled within the United States, of the

order sanctioning (confirming in U.S. terms) the plan of arrangement of MMA Canada (the

"Sanction Order"), which plan of arrangement had been unanimously accepted by all voting

creditors, including all classes of victims of the derailment (the "Derailment"), representing

nearly 4,000 votes and approximately $700 million in claims.  The Trustee supports the Petition

and the Motion, and files this Joinder to emphasize MMA Canada's eligibility for chapter 15

1

relief, along with the appropriateness of this Court recognizing and enforcing the orders of the

Québec Superior Court of Justice (Commercial Division) (the "Québec Court"), including the

Sanction Order.[1]   Additionally, the Trustee responds herein to the Objection of Canadian Pacific

Railway Co. [D.E. 31] (the "CP Objection") and the U.S. Trustee's Motion to Continue [D.E. 32]

(the "Motion to Continue").  In support hereof, the Trustee states as follows:

## PRELIMINARY STATEMENT

As Judge Brozman wisely stated years ago, in emphasizing the particular importance of

international comity in insolvency proceedings:

> Lurking in all transnational bankruptcies is the potential for chaos if the courts involved
> ignore the importance of comity.  As anyone who has made even a brief excursion into
> this area of insolvency practice will report, there is little to guide practioners or the
> judiciary in dealing with the unique problems posed by such bankruptcies.  Yet it is
> critical to harmonize the proceedings in the different courts lest decrees at war with one
> another result.

Petition of Brierly, 145 B.R. 151, 164 (Bankr. S.D.N.Y. 1992).  In recognition of this critical

principle, as detailed below, no United States court, in a reported decision, has ever failed to

recognize a proceeding under the Canadian Companies' Creditors Arrangement Act ("CCAA")

or failed to extend comity to, enforce, and provide assistance in favor of an order sanctioning a

plan of arrangement under the CCAA, with such courts uniformly finding that the CCAA's

provisions comport with our notions of due process, promote fundamental fairness, and are

---

[1]  The entry by this Court of an order enforcing the Sanction Order is a condition precedent to
confirmation of the Trustee's plan of liquidation:

> This Plan shall not be confirmed unless the Confirmation Order (a) is in a form and substance
> satisfactory to the Trustee and is otherwise consistent and in accord with the Settlement
> Agreements, and (b) approves and implements, among other things, (i) the Settlement
> Agreements, to the extent any of the Settlement Agreements have not otherwise or previously
> been approved by the Bankruptcy Court, and (ii) the Releases and Injunctions set forth in this
> Plan. In addition, Confirmation of this Plan is conditioned upon the entry of the CCAA. Approval
> Order and the Chapter 15 Recognition and Enforcement Order. The foregoing conditions to
> confirmation of this Plan are material and non-waivable.

Trustee's Revised First Amended Plan of Liquidation, § 9.1, Ch. 11 Case No. 13-10670, D.E. 1534.

consistent with all fundamental policies of the United States. That unbroken line of precedent includes multiple cases where sanction orders incorporate third-party releases, bar orders, and channeling injunctions.

Far from offending any public policy of the United States, as such decisions hold, such provisions are consistent with the law of the United States; indeed, every judicial circuit in this country would allow the fully-consensual releases provided in the Sanction Order and the plan it confirms. Indeed, the majority of the circuits, including the First, allow for *nonconsensual* third-party releases and related injunctive relief, and the ABI's Commission to Study the Reform of Chapter 11 has recommended that allowance of nonconsensual third-party releases be the law of the land. Far from offending U.S. public policy, Judge Boroff stated emphatically that identical release and injunction provisions in the New England Compounding Pharmacy ("NECP") plan and confirmation order represented the "highest and best use of the Bankruptcy Code…" Excerpt of Confirmation Hearing, attached hereto as **Exhibit A**; see also Confirmation Order, Ch. 11 Case No. 12-12982 (Bankr. D. Mass.), D.E. 1355. Thus, there is no legitimate argument that such provisions are even remotely "manifestly contrary to the public policy of the United States."

Against the overwhelming weight of this precedent, Canadian Pacific Railway Co.'s ("CP") objections are patently baseless, as discussed at length below. Indeed, CP, an entity domiciled in Canada, is wholly without standing to oppose recognition or the enforcement of the Sanction Order; this Court's order (simply extending the Sanction Order to persons or entities domiciled in the U.S.) would add nothing to CP's "burdens" nor would it limit its rights beyond what the Sanction Order already does. Not that it is even burdened by the Sanction Order. As Justice Dumas properly found in the Sanction Order, CP is not prejudiced in the least by the

Sanction Order, CP can freely defend itself and, if found by a future trial court to be jointly and

severally liable with any or all settling defendants, will be entitled to such judgment reduction as

is ordered by that trial court.  That is precisely what CP would be entitled to under U.S. law;

indeed, the Sanction Order may be more generous to CP. CP is now seeking leave to appeal the

Sanction Order, as it is entitled to do.  What CP is not entitled to do is to use meritless arguments

to oppose recognition and enforcement of the Sanction Order, or to oppose the U.S. Plan, solely

to delay the distribution of funds to the deserving victims of the Derailment in the vain hope of

increasing CP's settlement leverage.  That cynical and extortionate strategy should gain CP and

its counsel nothing except sanctions.

## ARGUMENT

### A.    MMA Canada is Eligible to be a Debtor Under Chapter 15 of the Bankruptcy Code Because it was Not a Railroad at the Time of the Chapter 15 Petition.

The Monitor has done an able job explaining MMA Canada's eligibility to be a debtor

under chapter 15 of the Bankruptcy Code.  The Trustee joins the Monitor in its argument that the

general eligibility requirements of § 109 of the Bankruptcy Code do not apply in chapter 15

cases, and even if they did, MMA Canada is eligible to be a debtor under the Bankruptcy Code.

The Trustee writes separately to emphasize that settled law establishes that the correct

time for determining the Monitor's and MMA Canada's eligibility for chapter 15 relief is as of

the petition date of the chapter 15 case, July 20, 2015 (the "Petition Date").  As of the Petition

Date, MMA Canada was unquestionably eligible to be a debtor under chapter 15.

The recent decision in In re Irish Bank Resolution Corp. Ltd., 2015 WL 4634831, at *1

(D. Del. Aug. 4, 2015) provides additional clear guidance, not that any is needed, on the issue of

chapter 15 eligibility.  Irish Bank addressed an argument that the debtor therein was ineligible for

4

chapter 15 relief due to the fact that § 1501(c)(1) provides that chapter 15 does not apply to 'a proceeding concerning an entity, other than a foreign insurance company, identified by exclusions in section 109(b)." Id. at *3.  (This is the same section relied upon by CP.) In examining whether the debtor in Irish Bank was a foreign bank with U.S. branches, and thus potentially ineligible for chapter 15 relief to the extent section 109(b) applied (see § 109(b)(3)(B)), the District Court affirmed the Bankruptcy Court's determination that  the "plain language of the statute clearly indicates that the relevant time period to consider is the date of the filing of the Chapter 15 petition, not the debtor's 'entire operational history.'" Id. at *3.  Since the debtor bank did not have U.S. branches at the time of the filing of the chapter 15 petition, even though it may have had them at a prior time, the debtor was unequivocally eligible for chapter 15 relief. Id.; See also, e.g., Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127, 130 (2d Cir. 2013) (finding that "the relevant time period is the time of the Chapter 15 petition…" in the context of determining the debtor's center of main interests), In re O.A.S. S.A., 533 B.R. 83, 100 (Bankr. S.D.N.Y. 2015).

MMA Canada sold all of its assets on July 30, 2014, and has not operated a railroad since that date.  Petition, ¶¶ 6 & 21.  It cannot be disputed that, as of the Petition Date, MMA Canada was not – and could not be – a railroad; MMA Canada neither transports people or freight, nor owns any tracks or related facilities of any kind. See 11 U.S.C. § 101(44) ("The term 'railroad' means common carrier by railroad *engaged in the transportation of individuals or property or owner of trackage facilities leased by such a common carrier.*") (emphasis supplied). Accordingly, because none of the other exclusions of § 109 apply to MMA Canada, MMA

5

Canada is eligible to be a debtor under chapter 15 of the Bankruptcy Code even if eligibility is determined by reference to section 109. [2]

**B.** **This Court Should Grant Comity to the Orders of the Québec Court and Enforce them in this Chapter 15 Case, Because the Provisions of the Orders are Permitted Under Canadian Law and Are Not Barred by the Public Policy Exception in Chapter 15.**

In determining whether to grant recognition and to extend comity to the Sanction Order, the Court must only determine that the CCAA affords due process of law to U.S. creditors and that the provisions of the CCAA and its implementation generally are not wholly repugnant to fundamental public policies of the United States. The long unbroken history of U.S. courts recognizing the CCAA and enforcing the orders of Canadian courts issued thereunder, including sanction orders containing third-party releases and channeling injunctions or bar orders, compels the conclusion that this Court should, indeed must, follow that unbroken line of cases and both recognize the CCAA case of MMA Canada as a foreign main proceeding and extend comity to and enforce the Sanction Order.

(i)    Comity Generally

The doctrine of international comity has long been recognized by courts of the United States. Hilton v. Guyot, 159 U.S. 113, 164 (1895). In Hilton, the Supreme Court defined comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens . . . ." Id. "The decision of a foreign tribunal is to be accorded comity where the [foreign] court properly exercised jurisdiction and where its ruling does not violate the public policies of the forum state." Id. at 202-03; Cornfield v. Investors Overseas

---

[2] CP cites to no authority whatsoever for its suggestion that the Court "should assess MMA's (sic.) status as a railroad at the time of the CCAA filing . . ." Presumably CP means MMA *Canada*, and not the U.S. debtor, MMA. If CP means MMA, its objection fails on its face.

Services, Ltd., 471 F.Supp. 1255, 1259 (S.D.N.Y. 1979); *aff'd* 614 F.2d 286 (2d Cir. 1979).

Indeed, in one of the earliest cases on international comity, the Supreme Court held that U.S.

bondholders were bound by the terms of a Canadian railroad restructuring and enjoined U.S.

suits on the bonds.   As a U.S. District Court described that early decision:   "In the spirit of

international comity and in recognition of the necessarily international reach of bankruptcy

decrees, the Supreme Court barred the action and ruled that the plaintiffs were barred by the

Canadian reorganization."   Pogostin v. Pato Consol. Gold Dredging, Ltd., 1981 WL 1613 at *3

(S.D.N.Y., March 23, 1981) (describing the holding in Canada Southern Rwy. V. Gebbard, 109

U.S. 527 (1883)).

 "Comity features prominently in cross-border insolvency cases."   In the Matter of

Thornhill Global Deposit Fund Ltd., 245 B.R. 1, 15 (D. Mass. 2000) (extending comity to, and

granting ancillary relief in support of, Bahamian insolvency proceedings: "affording comity does

not violate United States law or public policy.  The Bahamian laws are in many ways similar to

our own, and the Court so finds them.").   "American courts have long recognized the particular

need to extend comity to foreign bankruptcy proceedings."   Victrix S.S. Co., S.A. v. Salen Dry

Cargo A.B., 825 F.2d 709, 713 (2d. Cir. 1987).   Indeed, comity means that the U.S. court merely

judges the fundamental fairness of the foreign insolvency regime, not whether the results

generated by the foreign laws are identical to those that would be obtained in the United States or

whether the foreign insolvency laws mirror those in this country.   Indeed, Judge Brozman, in

extending ancillary injunctive relief to the benefit of English administrators under chapter 15's

predecessor, section 304 of the Bankruptcy Code, stated that:   "The congruence of the

Insolvency Act and the Bankruptcy Code convinces me that the comity factor supports a grant of

[the administrator's] ancillary petition.  Nothing dictates that the foreign law be a carbon copy of

our law; rather, the Insolvency Act must not be repugnant to American law and policies, which it is manifestly not." Brierly, 145 B.R. at 165-166.

Indeed, in cases decided under section 304, U.S. courts consistently extended comity to, and enforced, orders of foreign courts confirming restructuring plans under the law of the forum state.   In doing so, those courts also consistently held that the public policy exception to the extension of comity was extremely narrow and limited.   In The Argo Fund Ltd. v. Board of Directors of Telecom Argentina. S.A. (In re Board of Directors of Telecom Argentina, S.A.), 528 F.3d 162 (2d. Cir. 2008), the Second Circuit, in an opinion by Circuit Judge (later Justice) Sotomayor, upheld a bankruptcy decision that extended comity to and provided injunctive relief in support of a reorganization plan confirmed under the laws of Argentina.  Noting that "comity is the ultimate consideration in determining whether to provide relief under § 304," (Id. at 171), the court stated that "[c]omity, however, does not require that foreign proceedings afford a creditor identical protections as under U.S. bankruptcy law." Id. at 173. Accordingly, the circuit court upheld the order enforcing the Argentine restructuring plan even though it would not comply with the best interests of creditors test under chapter 11, and despite the fact that the distribution to all creditors would not be the same as under U.S. law.  Indeed, the circuit panel noted that a holding that required U.S. creditors to get identical relief as under the Code "would turn the principle of comity on its head and would fail to promote a 'friendly intercourse between the sovereignties' particularly necessary in bankruptcy proceedings." Id. at 172 (citing Hilton, 159 U.S. at 165).

Similarly, in In re Board of Directors of Multicanal S.A., 314 B.R. 486 (Bankr. S.D.N.Y. 2004), a bankruptcy court applying section 304 recognized another Argentine proceeding, and enforced orders confirming a plan under the laws of Argentina, including extending injunctive

relief, over the objection of dissenting U.S. creditors.  The court again noted that there "is no requirement that the foreign proceedings 'be identical to United States bankruptcy proceedings.'" Id. at 503.  Rather, the "key issue is one of due process and the public policy of the forum." Id. With respect to the issue of public policy, there "is no requirement that a foreign proceeding incorporate the conditions to confirmation set forth in § 1129 of the U.S. Bankruptcy Code." Id. at 506.  Thus the Argentine plan could be enforced within the United States even though the relevant laws governing the Argentine restructuring did not include a best interest of creditors test or the absolute priority rule.  It was also irrelevant that the laws of Argentina did not address avoidance actions in the same fashion as U.S. law:  "Although the procedures in Argentina are not identical to the treatment of preferences and fraudulent conveyances under U.S. insolvency law, they need not be." Id. at 508.  The "real issue is not whether the same procedures were followed as in a Chapter 11 case but whether there was fundamental due process afforded to Multicanal's creditors." Id. at 510.

The same considerations pertain under chapter 15.  "A central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings.  Comity is not defined in Chapter 15 but it pervades the statute." In re Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012).  While section 1506 allows a U.S. bankruptcy court to refuse to take an action under chapter 15 if the "action would be manifestly contrary to the public policy of the United States," courts construing section 1506 have held, consistent with the long history of international comity in insolvency proceedings, that the "public policy exception 'requires a narrow reading.'" O.A.S., 533 B.R. at 103 (citing Fairfield Sentry, 714 F.2d at 139).  "As the Second Circuit observed, federal courts in the United States have uniformly adopted the narrow application of the public policy exception." Id.  This narrow focus is required because of the

history of comity and because the "word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." <u>Id.</u> "Even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506. <u>Id.</u> at 104 (citing <u>In re Vitro S.A.B. de CV,</u> 701 F.3d 1031, 1069 (5th Cir. 2012)).

Indeed, the focus under section 1506 is at the "macro system" level; the inquiry is whether the foreign insolvency system as a whole "meets our fundamental standards of fairness and accords with the course of civilized jurisprudence." <u>Id.</u> at 103 (citing <u>In re Rede Energia, S.A.,</u> 515 B.R. 69, 98 (Bankr. S.D.N.Y. 2014).  Thus, the court enforced a plan confirmed under Brazilian law even though that law provided different standards for substantive consolidation than pertained under U.S. law, and different voting rules.  Indeed, as the Second Circuit has held, the U.S. court looks only at whether the foreign insolvency laws at issue comport with due process, and not whether the specific individual proceeding afforded all of the due process that a domestic chapter 11 might provide; otherwise, the United States court would be impermissibly acting as a super appellate court with respect to the foreign proceeding and permitting a collateral attack on the specific findings and conclusions of the foreign forum:

> Thus, in <u>Victrix,</u> the Second Circuit looked only to whether the "foreign laws" at issue comported with due process and not whether the specific individual proceeding afforded due process . . . <u>In re Metcalfe & Mansfield Alternative Invs.,</u> 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010) (holding that a U.S. bankruptcy court "is not required to make an independent determination about the propriety of individual acts of a foreign court."). To inquire into a specific foreign proceeding is not only inefficient and a waste of judicial resources, but more importantly, necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where creditors are always afforded the proverbial "second bite at the apple." Chapter 15's directive that courts be guided by principles of comity was intended to avoid such a result… St. James has not advanced the argument that creditors' interests are not sufficiently protected under French *sauvegarde* law and this Court has no reason to determine otherwise. In concluding that jurisdiction is limited to a determination that French *sauvegarde* proceedings generally are sufficient to protect creditors' interests, it follows that a bankruptcy court is without jurisdiction to inquire whether a particular creditor's interests are sufficiently protected in any specific foreign proceeding.

<u>SNP Boat Serv. S.A. v. Hotel Le St. James</u>, 431 B.R. 776, 785-86 (S.D.Fla. 2012)(citing and

quoting, *inter alia*, <u>Vitrix</u>, 825 F.2d at 714) (additional citations omitted). <u>See also</u>, <u>In re Irish</u>

<u>Bank Resolution Corp. Ltd.</u>, 2014 WL 9953792 at *20-21 (Bankr. D. Del. , April 30, 2014) ("the

[Irish] Act has simply established a different way to achieve similar goals of United States

statutes.  Granting recognition of the Irish proceeding would not only comport with the intent of

section 1506 of the Bankruptcy Code, but, more importantly, would also support the strong

policy of the United States in favor of a universalism approach to complex multinational

bankruptcy proceedings."); <u>In re Gerova Financial Group, Ltd.,</u> 482 B.R.86, 94-95 (Bankr.

S.D.N.Y. 2012) (Recognizing Bermuda insolvency proceedings even though Bermuda law

allows single creditor involuntary bankruptcy; "it is well-accepted that a foreign nation's

bankruptcy laws need not mirror those of the United States for its proceedings to be recognized

under chapter 15.").

Of similar import is Judge Chapman's recent and extensive opinion in <u>Rede Energia</u>, 515

B.R. 69.  Judge Chapman was presented with exactly the same request as is currently before this

Court, a request to recognize a Brazilian restructuring and to enforce the order confirming that

restructuring by entering relief under both sections 1507 and 1521 of the Bankruptcy Code.

Indeed, the case presents a comprehensive road map for these considerations. The starting point

of the analysis was as detailed above:  "Of particular significance to the case at bar is the well-

established principle that the relief granted in a foreign proceeding and the relief available in the

United States do not need to be identical."  <u>Id.</u> at 91.  While the public policy exception must be

acknowledged, "[h]owever, the public policy exception is clearly drafted in narrow terms and the

few reported cases that have analyzed section 1506 at length recognize that it is to be applied

sparingly." <u>Id.</u> at 92 (internal quotations omitted; collecting cases).  Reviewing the Brazilian

proceedings for fundamental fairness, and considering U.S. public policy, Judge Chapman found

"that the requested Plan Enforcement Relief is proper under both sections 1521 and 1507 of the

Bankruptcy Code and should be not be denied pursuant to the public policy exception in section

1506…" Id.[3]  The court found that the "request by the Foreign Representative that the Court (i)

enforce the [plan] and the Confirmation Decision and (ii) enjoin acts in the U.S. in contravention

of the Confirmation Decision is relief of a type that courts have previously granted under section

304 of the Bankruptcy Code and other applicable U.S. law." Id. at 93.  The court also found that

the interests of the debtors and the creditors, including the objecting U.S.-based creditors were

protected by the granting of the relief requested.  Id. at 94.

> With respect to section 1506 and public policy, Judge Chapman found that
>
> [N]either the Brazilian Reorganization Plan nor the Brazilian bankruptcy law concepts which are the bases of the Confirmation Decision are manifestly contrary to U.S. public policy. Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence.  Accordingly, the public policy exception reflected in section 1506 does not provide a basis for denial of the Plan Enforcement Relief.

Id. at 98.  This was true despite the fact that the Brazilian law (and the confirmed plan) provided

for substantive consolidation for plan purposes under an *ex parte* order, and under different

standards than would prevail in a U.S. court.  The court noted that substantive consolidation is

permitted under certain conditions under U.S. bankruptcy law.  The fact that the Brazilian court

ordered consolidation using different procedures or different factors was irrelevant: "it is not

appropriate for this Court to superimpose requirements of the U.S. law on a case in Brazil or to

second-guess the findings of a foreign court."  Id. at 100.[4]  To do so would impermissibly

transform her court into a foreign appellate court where the creditors are given a second bite at

---

[3] CP tries to make an issue regarding whether relief is available under either §1507 or §1521.  As Judge Chapman held in Rede Energia, this is a red herring.  Relief is available under *both* sections.

[4] Of course, substantive consolidation results in the effective *release* of intercompany and other claims.

the apple. Id. (citing Cozumel Caribe, 508 B.R. 330, 337 (Bankr. S.D.N.Y. 2014).    Judge

Chapman noted that the U.S. creditors had objected to substantive consolidation in Brazil and

were appealing the decision; thus they had enjoyed due process on this issue.    Public policy of

the United States was also not offended because the cram down standards were different under

Brazilian law, because the voting rules were different, because the distribution scheme was less

favorable than under U.S. law, or because different treatment of similarly situated creditors was

allowed (where the disparate treatment did not discriminate against U.S. creditors). Id. at 101-

107.    In conclusion, as to section 1506, the court concluded:

> The public policy exception embodied in section 1506 permits a court to decline to take
> any action, including granting additional relief or assistance pursuant to section 1521 and
> 1507 of the Bankruptcy Code, if such action would be manifestly contrary to the public
> policy of this country. Where, as here, the proceedings in the foreign court progressed
> according to the course of a civilized jurisprudence and where the procedures followed in
> the foreign jurisdiction meet our fundamental standards of fairness, there is no violation
> of public policy.

Id. at 107.

This narrow construction of the public policy exception and liberal application of comity

is not limited to bankruptcy cases.    As Judge Rakoff (S.D.N.Y.) found, even a seemingly

foundational element of U.S. law, the jury trial, is not required for recognition and enforcement

of foreign orders: "federal courts have enforced against U.S. citizens foreign judgments rendered

by foreign courts for whom the very idea of a jury trial is foreign."    In re Ephedra Products Liab.

Litig., 349 B.R. 333, 336 (S.D.N.Y. 2006) (enforcing CCAA claims procedure order which did

not allow for jury trials).

> (ii)    United States Courts Uniformly Recognize CCAA Cases
> and Uniformly Enforce Canadian Plan Sanction Orders.

Against this backdrop, both historical and under the current chapter 15, it is perhaps not

surprising that there is no reported decision where a United States court has failed to grant

recognition to a Canadian insolvency proceeding or failed to enforce a Canadian plan or plan

sanction order.  Insolvency proceedings in Canada are "routinely recognized under chapter 15."

Genova Financial Group, 482 B.R. at 95.  Proceedings under the CCAA were "routinely granted

comity" under section 304. Multicanal, 314 B.R. at 504.  "American federal courts have

uniformly and consistently granted comity to Canadian bankruptcy proceedings…" Raddison

Design Management, Inc. v. Cummins, 2008 WL 55998 at *2 (W.D. Pa., Jan. 3, 2008).  As the

court stated in E&L Consulting, Ltd. v. Domain Indus. Ltd.:

> Comity will be granted to the decision or judgment of a foreign court if it is shown that
> the foreign court is a court of competent jurisdiction, and that the laws and public policy
> of the forum state and the rights of its residents will not be violated.  This certainly holds
> true for Canada, a sister common law jurisdiction with procedures akin to our own.  As
> Judge Batts noted in Tradewell, Inc. v. American Sensors Electronics, 1997 WL 423075
> (S.D.N.Y. July 29, 1997), Canada's bankruptcy procedure under the [CCAA] satisfies the
> standards of procedural fairness established under the law of this circuit.

360 F. Supp. 2d 465, 470 (E.D.N.Y. 2005).  See also, Badalament, Inc. v. Mel-O-Ripe Banana

Brands, Ltd., 265 B.R. 732, 737 (E.D. Mich. 2001) ("Courts have consistently extended comity

to Canadian bankruptcy proceedings . . . There is no indication that the bankruptcy proceedings

in Canada do not comport with American notions of due process or that extending comity would

be prejudicial to the interests of American creditors."); Tradewell v. American Sensors

Electronics, Inc., 1997 WL 423075 at *1 (S.D.N.Y., July 29, 1997) (Canada is a "sister common

law jurisdiction with procedures akin to our own", and thus plaintiff could not contend "that the

CCAA violates American laws or public policy.").

    Accordingly, the authority of a Bankruptcy Court in the U.S. to enter an order enforcing a

CCAA plan sanction order is routine and non-controversial.  "The U.S. and Canada share the

same common law traditions and fundamental principles of law. Canadian courts afford creditors

a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process.

U.S. federal courts have repeatedly granted comity to Canadian proceedings." In re Metcalfe &

Mansfield Alternative Investments, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010); see also

Cornfeld v. Investors Overseas Servs., Ltd., 471 F. Supp. 1255, 1259 (S.D.N.Y.) aff'd, 614 F.2d

1286 (2d Cir. 1979) ("The fact that the foreign country involved is Canada is significant. It is

'well-settled' in New York that the judgments of the Canadian courts are to be given effect under

principles of comity.").

> (iii)    CCAA Orders Containing Third Party Releases and Injunctive Relief
>           Do Not Offend U.S. Public Policy

The Court in Metcalf confirmed that "the correct inquiry… is whether the foreign orders

should be enforced in the United States," as opposed to whether a U.S. court would be permitted

to grant the same relief in a plenary chapter 11 case. Metcalfe, 421 B.R. at 696. In In re Sino-

Forest Corp., 501 B.R. 655, 662 (Bankr. S.D.N.Y. 2013), the Bankruptcy Court reiterated its

ruling in Metcalf that "the correct inquiry in a chapter 15 case was not whether the Canadian

orders could be enforced under U.S. law in a plenary chapter 11 case, but whether recognition of

the Canadian courts' decision was proper in the exercise of comity in a case under chapter 15."

This question is relevant here primarily because the Sanction Order contains consensual

third-party releases for settling parties, and related injunctive relief. As Justice Dumas properly

found in his careful and well-reasoned Sanction Order, third-party releases are regularly allowed

under Canadian law, including in liquidation cases. Metcalfe involved the recognition and

enforcement of an order substantially similar to the Sanction Order, which contained third-party

releases. In the underlying Canadian proceedings in Metcalfe, the Court of Appeal for Ontario

held that the CCAA permits the inclusion of third party releases in a plan of compromise or

arrangement to be sanctioned by the court. Metcalfe, 421 B.R. at 694. The U.S. Bankruptcy

Court in Metcalf granted comity to the Canadian orders, specifically finding that it was not

precluded from doing so by the public policy exception under § 1506 of the Bankruptcy Code.

Id. at 698.  The Bankruptcy Court noted "that principles of enforcement of foreign judgments

and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of

the third-party non-debtor release and injunction provisions included in the Canadian Orders,

*even if those provisions could not be entered in a plenary chapter 11 case*." Id. at 696 (emphasis

added).

Sino-Forest, decided after Metcalfe, also involved the recognition and enforcement of an

order substantially similar to the Sanction Order.[5]  There, the Bankruptcy Court noted that the

Canadian courts "specifically found that the approval of the Sanction Order and the Settlement

Order was consistent with a prior opinion of the Court of Appeal for Ontario establishing the

requirements for third-party releases under the CCAA." Sino-Forest, 501 B.R. at 658 (the "prior

opinion" being the Ontario court's decision referenced in Metcalfe).  As in Metcalfe, the

Bankruptcy Court granted comity to the Canadian orders, and found that § 1506 did not preclude

it from doing so. Id. at 665.

Finally, the case of Muscletech Research and Development Inc. ("Muscletech") is

particularly on point for present purposes, as it involved a liquidating case where the entire

purpose of the CCAA filing was to deal with the wide-ranging products liability claims in the

case and where, without the contributions of the third parties who were to benefit from third-

party releases and injunctions, no funds would have existed to pay a meaningful dividend.  The

Endorsement of the Canadian court in Musceltech provides extensive support for the approval,

---

[5] Sino-Forest addresses Vitro, a case determined after Metcalfe, which declined to grant comity to a
Mexican order regarding a reorganization plan.  Sino-Forest distinguishes Vitro, given that it was decided
on the grounds that "the bankruptcy court did not abuse the discretion expressly provided in section
1507(b)."  Further, Sino-Forest distinguishes the unique facts of Vitro, specifically that it concerned "a
Mexican court order approving a reorganization plan that vitiated guarantees issued by [the debtor's]
U.S.-based affiliates, under loan agreements governed by U.S. law." Sino-Forest Corp., 501 B.R. at 665.

under Canadian law, of a plan sanction order that provides for third-party releases, stating, in

relevant part:

> It is also, in my view, significant that the claims of certain of the Third Parties who are
> funding the proposed settlement have against the Applicants under various indemnity
> provisions will be compromised by the ultimate Plan to be put forward to this court. That
> alone, in my view, would be a sufficient basis to include in the Plan, the settlement of
> claims against such Third Parties. The CCAA does not prohibit the inclusion in a Plan of
> the settlement of claims against Third Parties.

Musceltech Endorsement, p. 7, attached hereto as **Exhibit B**.

The plan sanction order in Muscletech was recognized and enforced by Judge Rakoff.  A

copy of the order is attached hereto as **Exhibit C**.  See also, In re Ephedra Products Liab. Litig.,

349 B.R. 333 (S.D.N.Y. 2006) (recognizing and enforcing Canadian order approving claims

resolution procedure in Musceltech).

In the Sanction Order, the Québec Court explicitly found that the relief requested,

including third-party releases were fair and reasonable, and addressed CP's arguments to the

contrary, stating, in relevant part:

> [65] In short, the undersigned not only believes that the proposed plan is fair and
> reasonable but to accept the arguments presented by CP would undermine public
> confidence in the courts.

Accordingly, because (1) the CCAA permits the inclusion of third-party releases in a plan

of compromise or arrangement, (2) the Sanction Order was entered by a Canadian court of

competent jurisdiction, and (3) U.S. courts have routinely granted comity to plan sanction orders

of Canadian courts that provide substantially similar relief, including third-party releases, this

Court should recognize and enforce the Sanction Order, pursuant to its authority under chapter

15 of the Bankruptcy Code and the principles of comity.

### C.     The Relief Contained in the Sanction Order Is Permitted Under U.S. Law, and is not Manifestly Contrary to Public Policy of the United States.

Although the correct inquiry is whether foreign orders should be enforced in the United States – as opposed to whether a U.S. court would be permitted to grant the same relief in a plenary chapter 11 case – the Trustee submits that U.S. law provides an independent basis for the relief contained in the Sanction Order, including third-party releases. This further supports this Court's recognition and enforcement of the Sanction Order and obviates any concerns over the public policy exception of § 1506 of the Bankruptcy Code.

Under First Circuit law, this Court can confirm a plan that contains nonconsensual third-party releases and an accompanying channeling injunction on a standalone basis under U.S. law. The First Circuit has addressed and tacitly approved the concept of nonconsensual third-party releases in plans. Monarch Life Insurance Co. v. Ropes & Gray, 65 F.3d 973 (1st Cir. 1995); see also, In re G.S.F. Corp., 938 F.2d 1467, 1474 (1st Cir. 1991) (holding that Bankruptcy Code section 105(a) confers ample power to enjoin suit against nondebtors during the pendency of a chapter 11 case where the court reasonably concludes that such actions would entail or threaten adverse impact upon the administration of the chapter 11 case).[6]

---

[6] Direct authority for a bankruptcy court's order conferring nonconsensual third-party releases and issuing a channeling injunction is found in the United States Supreme Court's decision in U.S. v. Energy Resources Co., 495 U.S. 545, 110 S. Ct. 2139, 109 L.Ed.2d 580 (1990) (affirming First Circuit decision that a bankruptcy court has authority to order IRS to treat tax payments made by Chapter 11 debtor corporations as trust fund tax payments, thus releasing potential insider "responsible persons" from liability, if the bankruptcy court determines that this designation is necessary to the success of a reorganization plan). The Supreme Court's decision was grounded in 11 U.S.C. §§105(a), 1123(b)(5) and 1129. Energy Resources, 495 U.S. at 549. "These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." Id. See also, Joshua M. Silverstein, Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations, 23 EMORY BANKR. DEV. J. 13 (Fall 2006) ("…Energy Resources vindicates the pro-release position on every major issue concerning the validity of non-debtor releases. Therefore, under existing precedent, bankruptcy courts possess the equitable power to extinguish claims against third parties."). See also Travelers Indem. Co. v. Bailey, 557 U.S. 137, 129 S. Ct. 2195, 2207 (2009) (reversing 2nd Circuit; bankruptcy court's jurisdiction to enter, and enforceability of, Manville channeling injunction could not be collaterally

Given this guidance, lower courts in the First Circuit have followed suit.  In confirming plans, nonconsensual third party permanent injunctions or releases, are permitted in "exceptional circumstances" and are within the court's authority to issue under §§ 105(a), 1123(b).  In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 98-103 (Bankr. D. Mass. 2013); In re Chicago Investments, LLC, 470 B.R. 32, 95-96 (Bankr. D. Mass. 2012); In re M.J.H. Leasing, Inc., 328 B.R. 363, 369 (Bankr. D. Mass. 2005); In re Mahoney Hawkes, LLP, 289 B.R. 285, 297 (Bankr. D. Mass. 2002) (holding that § 524(e) does not prohibit third party injunctions and instead simply explains the effect of a debtor's discharge).

Courts within the First Circuit have adopted the Master Mortgage test for determining when a permanent injunction or release in favor of a non-debtor third party is warranted.  See Mahoney Hawkes, 289 B.R. at 297-98 (citing In re Master Mtg. Inv. Fund, Inc., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); see also Charles Street African Methodist Episcopal Church, 499 B.R. at 100; Chicago Investments, 470 B.R. at 95-96; In re The Ground Round, Inc., 2007 WL 496656 (Bankr D. Mass. Feb. 13, 2007) (finding Master Mortgage test applicable to determination of whether third party injunctions will be allowed).  The Master Mortgage test looks to five factors:

    i.    An identity of interests between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

    ii.    The non-debtor has contributed substantial assets to the reorganization;

    iii.    The injunction is essential to the reorganization;

---

challenged; "We do not resolve whether a bankruptcy court . . . could properly enjoin claims against non-debtor insurers that are not derivative of the debtor's wrong doing.");  Johns-Manville Corp. v. The Travelers Indemnity Co. (In re Johns Manville Corp.), 2014 WL 3583780 at *7 (2d. Cir., July 22, 2014) ("The injunction that Bailey approved, therefore, bars … nonderivative claims against nondebtor Travelers …").

    iv.    A substantial majority of creditors agree to such injunction, specifically, the impacted class, or classes, has overwhelmingly voted to accept the proposed plan treatment; and

    v.    The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

Master Mortgage, 168 B.R. at 935.

The debtor does *not* need to prove the existence of all five of these factors; "[t]hese factors are neither exclusive nor conjunctive requirements."  Charles Street African Methodist Episcopal Church, 499 B.R. at 100; Chicago Investments, 470 B.R. at 95;  M.J.H. Leasing, Inc., 328 B.R. at 369.  The factors are a "useful starting point."  Charles Street African Methodist Episcopal Church, 499 B.R. at 100.

On this point, Chicago Investments is instructive.  The court, in confirming the challenged plan, rejected arguments that the third-party releases were impermissible and overbroad.  The court found that the released parties were supplying "substantial consideration," that the "injunction was essential to the reorganization because neither [the principal funding source] nor its related entities would go forward without it," the affected creditors were being paid in full, and the creditors had voted in favor of the plan.  Chicago Investments, 470 B.R. at 95-96.

Payment in full is not, however, required; the plan must simply provide a "mechanism" for the substantial payment of affected claims.  The Charles Street African Methodist Episcopal Church court held that the plan should "replace what it releases with something of indubitably equivalent value to the affected creditor," such as a settlement fund to which claims are channeled.  499 B.R. at 102.  An adequate settlement fund (as is present here) has consistently been held to be such a "mechanism."

The approach in the First Circuit is in the majority; the Second, Fourth, Sixth, Seventh, and Eleventh Circuits at least, all allow for nonconsensual, nondebtor releases in plans. See generally, Jason W. Harbour & Tara L. Elgie, *The 20-Year Split: Nonconsensual Nondebtor Releases*, 21 J. Bankr. L. & Prac. 1 (July 2012). See also SE Property Holdings, LLC v. Seaside Engineering & Surveying, Inc. (In re Seaside Engineering & Surveying Inc.), 780 F. 3d 1070, 1077-1080 (11th Cir. 2015) (noting 11th Circuit is with the majority in allowing nonconsensual third party releases and correcting Vitro court on this point); Behrmann v. National Heritage Foundation, Inc., 663 F.3d 704, 712 (4th Cir. 2011) (noting that third party injunctions are permissible and finding test articulated in In re Railworks Corp., 345 B.R. 529, 536 (Bankr. D. Md. 2006) "instructive," which test considered whether there was "overwhelming approval for the plan . . . a close connection between the causes of action against the third party and the causes of action against the debtor . . . the injunction is essential to the reorganization . . . and . . . the plan of reorganization provides for payment of substantially all of the claims affected by the injunction."); In re Global Indus. Tech., Inc., 645 F.3d 201, 205 (3d Cir. 2011) (stating that "[f]or the Plan to be approved as designed (i.e., with the inclusion of the Silica Injunction), the debtors needed to show that the Plan's resolution of silica-related claims is necessary or appropriate under 11 U.S.C. § 105(a), which . . . requires showing with specificity that the Silica Injunction is both necessary to the reorganization and fair."); SEC v. Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992) (stating that "[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.").

Judge Sean Lane (Bankr. S.D.N.Y.) recently affirmed the availability of nonconsensual third party releases in an appropriate case, after canvassing relevant Second Circuit authority. In

21

re Genco Shipping & Trading Ltd., 513 B.R. 233, 268-69 (Bankr. S.D.N.Y. 2014) (citing and applying Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005)).   Applying the Metromedia factors to the releases proposed in the plan, Judge Lane approved all of the "consensual" releases, including those by parties who expressed consent by failing to check a box on the plan ballot opting out of the releases, even if such creditor voted to reject the plan.   Second, the court approved all nonconsensual third-party releases for claims that would trigger indemnification or contribution claims against the debtors, explaining that the purpose of such releases is to align with indemnification obligations of the debtors that existed before the filing of the chapter 11 case, such as indemnification obligations that arise under employment agreements, by-laws, loan agreements, and similar agreements.   Third, the court approved nonconsensual third-party releases in favor of all parties who provided substantial consideration to the plan by (a) agreeing to forego consideration to which they would otherwise be entitled; (b) providing new value to the debtors by agreeing to "backstop" or guaranty a rights offering; or (c) agreeing to exchange debt for equity in the reorganized debtor.   Id..   Thus, the case reaffirms that a plan can require holders of claims to grant a release to non-debtors even where those parties do not consent (by voting for a plan or checking a box), provided one or more of the Metromedia factors is present, such as the fact that the claims will give rise to indemnity or contribution claims against the debtor's estate or the plan provides for an adequate settlement fund to which the claims are channeled.   Id.

Indeed, the Fourth Circuit, in a decision reaffirming the ability of bankruptcy courts to confirm plans containing nonconsensual third-party releases when one or more of the so-called Dow Corning factors[7] is/are met, recently emphasized the weight given to the creation of an

_____

[7] The Dow Corning factors are similar to the Master Mortgage factors.   In re Dow Corning Corp., 255 B.R. 445, 479 (E.D. Mich. 2000).

adequate settlement fund to which claims are channeled in approving nonconsensual third-party

releases in a plan.  National Heritage Found., Inc. v. Highbourne Found., 2014 WL 2900933 (4th

Cir. June 27, 2014).

Additional recent authority emphasizes that nonconsensual nondebtor releases can be a

permissible feature of *liquidating* chapter 11 plans, where one or more of the Master Mortgage

factors are present.  See e.g., In re U.S. Fidelis, Inc., 481 B.R. 503, 518-21(Bankr. E.D. Mo.

2012).  Addressing the non-debtor releases in the plan of liquidation before it, which contained a

settlement addressing consumer claims against the debtor funded by the released parties, the

court (applying Master Mortgage) stated:

> Even if the releases in the Plan cannot be determined to be consensual, under persuasive
> precedent from the U.S. Bankruptcy Court for the Western District of Missouri, this fact
> does not make confirmation of the Plan per se improper.  *See* In re Master Mortgage
> Invest. Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994).  Under Master Mortgage, the
> court may confirm a plan that includes compelled releases of non-debtors, if such
> extraordinary relief is warranted.  Specifically, releases may be included in a confirmed
> plan if exceptional circumstances exist, the releases are widely supported by the creditor
> constituency (including those creditors who will be restrained), the constituency to be
> restrained receives significant benefits, and the creditors as a whole are being treated
> fairly.  Id. at 935.

> All these Master Mortgage requirements are fulfilled here.  Exceptional circumstances
> exist.  Despite the incredibly complex nature of the claims and interests among and
> between the major parties in this Case, a unique and singular opportunity has presented
> itself in the hard-negotiated [general settlement agreement ("GSA")]: a significant return
> to the consumer creditors.  However, if the third party releases are not permitted in the
> Plan, the GSA evaporates, as neither Mepco nor Warrantech would agree to its terms.
> Instead, the UCC, Mepco, and Warrrantech would spend years litigating, resulting in a
> significant loss to the estate.  Meanwhile, the consumer creditors most likely would end
> up with little return, and no return in the near future (further devaluing whatever return
> they may receive, if any).  This is not a circumstance where the Debtor and its secured
> creditors filed for bankruptcy relief with the pre-conceived purpose of buying third-party
> releases at a lowball price.  The opposite is true, and the GSA offers the rare opportunity
> to actually serve the truly injured.

> Additionally, the releases were widely supported by the consumer creditors, directly and
> through the Attorneys General.  No consumer creditor who would actually be restrained
> by the releases objected to confirmation, and the overwhelming majority of consumer

creditors who cast a ballot voted to accept the Plan.  All the Attorneys General that cast ballots voted to accept the Plan (and none objected), and the Steering Committee filed a brief in support of confirmation.  And, the consumer creditors stand to obtain the significant benefit in the form of a distribution from the CRF.

Last the consumer creditors as a whole would be treated fairly. Master Mortgage provides that the court should look at five factors in determining the necessity and fairness of third-party releases included in a proposed plan.

Id. at 518-19.  The court directly addressed the use of such releases in liquidating plans:

This Case is—in bankruptcy vernacular—a "liquidating 11."  A bankruptcy case may proceed as a liquidating 11, if doing so would benefit the creditors (including the unsecured creditors).  It is a well-established use of chapter 11 relief.

A few courts suggest that compelled releases may not be appropriate in a liquidating 11 because the debtor necessarily does not need such extraordinary relief for the purpose of reorganizing.  The Court recognizes this concern and the possible abuse that could occur if the releases of non-debtors are commonly included in a plan of liquidation.  However, an orderly liquidation is a valid use of chapter 11 and one of its chief purposes—to ensure the best return for the unsecured creditors—should be promoted.  If the plan of liquidation ensures the best possible outcome for unsecured creditors and the releases therein are critical to confirmation of the plan, then the fact that the case is not a reorganization should not per se prohibit confirmation of the plan.  As discussed in Footnote 8 herein, Mepco will substantially contribute to the orderly liquidation of the Debtor, just as Warrantech and the Debtor itself will do.

Id. at 520.

Moreover, NECP confirms that third-party releases are available in the First Circuit *and* in liquidating chapter 11 cases.  NECP involved facts and circumstances substantially similar to those faced by MMA and MMA Canada.  In each case, a trustee was tasked with administering an estate with few valuable assets, and ultimately negotiated settlements that provided for third-party releases in exchange for sizable settlement payments.  In approving NECP's chapter 11 plan, which provided extensive releases in favor of settling parties, Judge Boroff stated that the result was an example of the "highest and best use of the Bankruptcy Code." See **Exhibit A**.

In addition to the abundant and unequivocal support for approval of third-party releases explained above, the ABI Commission to Study the Reform of Chapter 11 has recommended that

24

the availability of third-party releases *be codified* and incorporate the Master Mortgage factors. Harner, Michelle M., FINAL REPORT OF THE ABI COMMISSION TO STUDY THE REFORM OF CHAPTER 11, pp. 252-56 (2014). This recommendation alone would indicate that third-party releases do not violate public policy. See Gerova, 482 B.R. at 95 (Bankr. S.D.N.Y. 2012) (Examining the report of the commission that led to the 1978 Code, and stating: "It cannot seriously be argued that the distinguished members of the national commission whose report led directly to the 1978 Code suggested a change that violated a fundamental public policy.").

Indeed, even the minority of circuits that do not permit nonconsensual third-party releases would authorize the *fully-consensual* release contained in the Sanction Order and the plan it confirms. The Sanction Order was entered based on the *unanimous* acceptance of all voting creditors (nearly 4000), including all voting classes of Derailment victims. Under applicable U.S. standards, the releases in the Sanction Order are clearly consensual. See, e.g., In re Specialty Equip. Cos., Inc., 3 F. 3d 1043 (7th Cir. 1993); In re Indianapolis Downs, LLC, 486 B.R. 286, 305-06 (Bankr. D. Del. 2013); In re Adelphia Communications Corp., 368 B.R. 140, 260-70 (Bankr. S.D.N.Y. 2007); In re Conseco, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003). Even the Ninth and Fifth Circuits allow for plan-based voluntary third-party releases premised on such consent. In re Patriot Place, Ltd., 486 B.R. 773, 822 (Bankr. W.D. Tex. 2013) (emphasizing that 5th Circuit precedent only applies to nonconsensual releases); Billington v. Winograde, (In re Hotel Mt. Lassen, Inc.), 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997)(Ninth Circuit case law permits consensual releases); In re Continental Colors, Case No. LA 98-52676-ES (Bankr. C.D. Cal 1999)(same).[8]

Accordingly, nothing stands in the way of the Court recognizing and enforcing the Sanction Order. The third-party releases provided therein are unequivocally allowed under

---

[8] Unpublished cases cited herein are available from counsel to the Trustee, upon reasonable request.

Canadian law, and are further allowed under U.S. bankruptcy law.  The public policy exception of § 1506 is to be narrowly construed, and applied only in situations that threaten "the most fundamental policies of the United States."  <u>Metcalfe</u>, 421 B.R. at 697 (citing <u>Muscletech</u>).  In that inquiry, the "key determination" is whether the Canadian procedure "meet[s] our fundamental standards of fairness."  <u>Id.</u>  The Québec Court's proceedings in issuing the Sanction Order substantially followed U.S. principles of due process and notice:  the proceedings were open and public; relevant parties received notice of all pleadings and hearings; the court provided an opportunity to object or respond and considered objections and responses; and there was an opportunity to appeal the Sanction Order under Canadian law.  <u>Sino-Forest</u> explicitly found that "where third-party releases are not categorically prohibited, it cannot be argued that the issuance of such releases is manifestly contrary to public policy."  <u>Sino-Forest</u>, 501 B.R. at 665.[9]

**D.      CP Lacks Standing to Object to the Petition or the Motion, and the CP Objection is a Poorly Veiled Attempt to Collaterally Attack the Québec Court's Orders and Transform the Bankruptcy Court into a Court of Appeals for the Québec Court.**

CP makes five primary (and ultimately flawed) arguments against enforcement and recognition of the Québec Court's orders.  Tellingly, the first three arguments are all explicitly complaints with the Sanction Order itself, and barely brush up against the standard for granting recognition to foreign proceedings under chapter 15.

First, CP argues that the Sanction Order's terms provide relief that "far exceed[s] anything authorized by U.S. law."  This argument fails for two reasons.  One, as explained above, the standard for granting recognition of foreign proceedings in chapter 15 cases does not depend in any way on whether the same relief would be available under U.S. law.  Two, also as

---

[9] Sino-Forest notes that the court in <u>Vitro</u> "specifically declined to decide the case on one of the alternative bases of the bankruptcy court's ruling—*namely, whether the third-party release was manifestly contrary to public policy*." (emphasis added).

26

explained above, the relief in the Sanction Order unequivocally *is allowed* under U.S. law (if that test were even necessary, which it is not).

Second, CP argues that the Sanction Order confers "one-sided protection to settling non-debtor entities in derogation of CP's due process rights." As the Sanction Order itself indicates, this statement is patently false; nothing in the Sanction Order affects CP's defenses or right to judgment reduction. CP has had ample due process (including the right to appeal, which CP has exercised) and CP's overwrought objections are simply litigation tactics.

Third, CP argues that the releases and injunction contained in the Sanction Order are not allowed under Canadian law and extinguish CP's rights to contractual indemnification and set-off against non-debtors. Like its other arguments, this argument is clearly CP's attempt to have this Court serve as an appellate court for the Québec Court. Not only has the Québec Court found that the releases and injunction contained in the Sanction Order are allowed under Canadian law, but the Sanction Order does nothing to diminish CP's rights to argue contributory negligence, relative liability, and proportionate judgement reduction in defending itself against the various lawsuits that it faces, including arguing that its liability is $0.00.

Fourth, CP argues that MMA Canada is ineligible for chapter 15 relief because it is a foreign railroad. This half-baked argument fails for the reasons set forth above.

Finally, CP argues that because it has appealed the Sanction Order in Canada, this Court should refrain from enforcement of the Québec Court's orders. Caselaw directly on point indicates that this argument has no merit whatsoever.

1.     CP Lacks Standing to Object to the Petition or the Motion

Standing is a "threshold question in every federal case." Warth v. Seldin, 422 U.S. 490, 498 (1975). "[T]he standing question is whether the [party] has 'alleged such a personal stake in

the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Id. at 498-99. "[S]tanding . . . is accorded only to a 'person aggrieved.' The 'person aggrieved' paradigm, which delimits appellate jurisdiction even more stringently than the doctrine of Article III standing, bestows standing only where the challenged order directly and adversely affects an appellant's pecuniary interests. Spenlinhauer v. O'Donnell, 261 F.3d 113, 117-18 (1st Cir. 2001) (citations omitted). "[S]tanding exists only where the order directly and adversely affects an appellant's pecuniary interests. A party's pecuniary interests are affected if the order diminishes the appealing party's property, increases its burdens, or detrimentally affects its rights." In re N2N Commerce, Inc., 405 B.R. 34, 39 (Bankr. D. Mass. 2009), citing Kehoe v. Schindler (In re Kehoe), 221 B.R. 285, 287 (1st Cir. B.A.P. 1998) (quotations and internal citations omitted); see also In re Murphy, 288 B.R. 1, 4 (D. Me. 2002).

With the exception of its fourth and fifth arguments, both of which are completely without merit, CP's arguments are, by their own terms, impermissible appeals of the Sanction Order. Because CP is not domiciled in the U.S. (as CP has strenuously argued elsewhere), but rather in Canada, this Court's recognition and enforcement of the Sanction Order will not enlarge or extend the Sanction Order's effect on CP in any way. [10] Recognizing the CCAA case and

---

[10] Elsewhere in related proceedings, CP has argued extensively that it is not domiciled in the U.S. and has minimal contacts with the U.S.:

> CP does minimal business in the U.S. and did nothing in the U.S. regarding the train that derailed.
> …
> CP is a corporation organized and existing under the laws of Canada, with its principal place of business in Calgary, Canada, and with a place of business in Montreal, Quebec, Canada.
> …
> Besides not being incorporated or having a principal place of business in the U.S., CP's only connection (besides bringing trains 10 miles or less into the U.S. to safely turn over to U.S. crews) with the U.S. is the filing of a proof of claim in MMAR's bankruptcy for debts incurred in Canada.

enforcing the Sanction Order within the U.S. *as to persons and entities domiciled in the U.S.* is not relief that reaches CP; CP is *already bound* by the Sanction Order, and appealing from same. By definition, this Court's orders will not vary CP's legal burdens.[11]

CP's second and third arguments are essentially that it will face tort liability from victims of the Derailment, and this fact somehow gives it standing to oppose recognition and enforcement of the Sanction Order. First, CP's plight again derives solely from the *Sanction Order*, not from this Court's orders. Moreover, Maine courts have explicitly found that the fact that a party will have to defend itself in independent tort actions does not establish a basis for standing. Kemper Life. Ins. Co. v. Bezanson (In re Medomak Canning Co.), 123 B.R. 671, 673-74 (D. Me. 1991); Murphy, 288 B. R. at 4. Further, because this Court's recognition and enforcement of the Sanction Order will not impair CP's rights in any way (as explained below), and in any event not in any way not already accomplished by the Sanction Order, CP cannot argue that it has standing due to being an aggrieved party for some other reason related to this Court's order. See Medomak Canning, 123 B.R. at 674 ("[Appellants's] rights in that respect are in no way impaired by the order of compromise, which specifically preserves all defenses which [it] may have against the negligence claim which has now been brought against it.").

Chapter 15 neither creates nor enhances CP's right to object to the Petition and the Motion. In Drawbridge Spec. Opps. Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 242-43 (3d Cir. 2013), on appeal of a recognition order substantially similar to the relief requested in the

---

Canada Pacific Railway Company's Motion to Dismiss, [D.E. 140, Adv. Proc. 14-1001].

[11] A court examining whether to recognize and enforce a foreign order should be focused primarily on the interests of domestic creditors. See In re Atlas Shipping A/S, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009) ("this relief [should] only be granted if the interests of local creditors are 'sufficiently protected.'"). Here, CP is a Canadian creditor already bound by the Sanction Order, not a domestic creditor. See also, In re Tri-Cont'l Exch. Ltd., 349 B.R. 627 (Bankr. E.D. Cal. 2006), In re Sivec SRL, 476 B.R. 310 (Bankr. E.D. Okla. 2012).

Motion, the Third Circuit Court of Appeals found that the because the recognition order neither named nor directed any relief against the movant, and because the movant was not affected by the automatic relief provided for in § 1520, the movant lacked standing to appeal the order. Moreover, even if CP has alleged some cognizable "potential harm" from this Court's recognition of the Sanction Order, even that is not sufficient to give CP standing. Id. at 243 ("Indeed, we have explicitly stated that 'potential harm' from a bankruptcy court order is insufficient to justify appellate standing.").

Accordingly, CP has no personal stake and no pecuniary interest in the outcome of the Petition or Motion, its burdens would not be increased by this Court's orders, and thus CP lacks standing to object. Neither the Petition nor the Motion names CP or directs any relief against CP; CP, as an entity domiciled in Canada, is already bound by the terms of the Sanction Order in Canada, and this proceeding simply gives that order extraterritorial effect in the U.S. (a jurisdiction where CP maintains that it is not domiciled and has minimal contacts). See Barnet, 737 F.3d at 243.

  2.    The Sanction Order Preserved All of CP's Defenses and Does Not Prejudice CP In Any Way; Indeed, It Is Foursquared with Applicable U.S. Law

The Sanction Order itself has already addressed all of CP's arguments regarding alleged one-sidedness or prejudice, further supporting that CP's Objection is nothing more than an improper attempt at extraterritorial appeal at odds with all principles of comity. As the Sanction Order states, in relevant part:

> [48] In this case, the releases sought are an essential condition to the viability of the Plan since the Released Parties are the only ones financing the Plan. This weighs strongly in favour of the fair and reasonable nature of the releases sought:
>> [23] [...] As stated above, in my view, it must be found to be fair and reasonable to provide Third Party Releases to persons who are contributing to the Contributed Funds to provide funding for the distributions to creditors pursuant to

the Plan. Not only is it fair and reasonable; it is absolutely essential. There will be no funding and no Plan if the Third Party Releases are not provided.

[49] Alternatively, CP also submits that the Plan may not be used as a tool to settle disputes between solvent third parties without granting a release to MMAC. This subsidiary argument is in line with CP's argument that the Plan negatively impacts its rights.

[50] Indeed, CP submits the following :

> Since CP's liability is, among others, sought on a solidary basis in the class action, and since CP is not a Released Party under the Plan, its rights shall be directly and considerably affected.

[51] CP submits inter alia that the partial settlement of multi-party litigation must be at least a neutral event for the defendants that are not parties to the settlement.

[52] It submits that the Plan does not grant CP the ordinary protections it would receive under the partial settlement of a class action in civil law.

[53] **As already mentioned, nothing will prevent CP from defending itself in any action brought against it. If it is not liable, the action will be dismissed.**

[54] **If it claims that the damages were caused by a third party, it may submit this argument even if such third party is not involved in the proceedings.**

[55] **In fact, there would even be an advantage for CP as it may continue to argue that the tragedy is everybody's fault, except its own.**

…

[57] **In short, if CP is not liable, the action shall be dismissed against it.**

[58] **If it is liable, and third parties also liable were released, CP will be released from the portion of liability attributable to the solidary debtors that were released.**

[59] **In fact, what would be unfair would be to allow CP to benefit from a release while it did not financially contribute to the Plan, contrary to the other co-defendants**. (Emphasis added).

To the extent relevant, this is exactly the same result as would pertain under U.S. law.

Courts have routinely held that proportionate judgment reduction is a sufficient preservation of

rights for non-settling parties affected by bar orders.  As the Bankruptcy Court in In re Tribune

Co., found:

> The Bar Order is fair to the [non-settling defendants] because, as non-settling defendants, they are protected by the proportionate judgment reduction, which is the equivalent of a contribution claim . . . McDermott, Inc. v. AmClyde, 511 U.S. 202, 209 (1994) ("Under this [proportionate share] approach, no suits for contribution from the settling defendants are permitted, nor are they necessary, because the nonsettling defendants pay no more than their share of the judgment.").
> …
> I conclude that the Bar Order is not an improper third party release as to the [non-settling defendants] because any lost contribution or non-contractual indemnification claims are replaced by the protections of the judgment reduction provision.

464 B.R. 126, 179-180 (Bankr. D. Del.)  See also In re Tribune Co., 464 B.R. 208, 223-24

(Bankr. D. Del. 2011) (proportionate judgment reduction fair to settling defendants faced with

bar order); In re Semcrude, L.P., 2010 WL 4814377 at *2 (Bankr. D. Del. 2010) ("As the

Settlement contains a provision preserving any state law setoff or judgment reduction rights of

potential contribution claimants, the Settlement does not appear to deprive PWC [a non-settling

defendant] of any material contribution rights.  Accordingly, due process issues do not arise and

the Settlement should be approved.").

Indeed, U.S. federal courts outside of bankruptcy, in asbestos cases, securities class

actions, ERISA class actions, and similar cases, regularly approve partial settlements containing

bar orders that prevent contribution and indemnity claims by non-settling defendants against

settling defendants, while providing non-settling defendants with judgment reduction.

> Partial settlements which feature the entry of bar orders are neither unusual nor
> presumptively inappropriate.  Such orders barring the interposition of contribution and
> indemnity claims can not only provide powerful incentive for a party such as [non-
> settling party] to enter into a settlement, but indeed in most instances represent
> indispensable features of negotiated partial agreements.

Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson, 409 F. Supp. 2d 136, 142-43

(N.D.N.Y. 2005).   "[C]ourts may approve provisions in settlement agreements that bar

contribution and indemnification claims between the settling defendants and non-settling

defendants so long as there is a provision that gives the non-settling defendants an appropriate

right of set-off from any judgment imposed against them."  In re WorldCom, Inc. ERISA Litig.,

339 F. Supp. 2d 561, 568 (S.D.N.Y. 2004); see also Eichenholtz v. Brennan, 52 F.3d 478, 487

(3d Cir. 1995), In re Enron Corp. Sec., Derivative & "ERISA" Litig., 228 F.R.D. 541, 559-60

(S.D. Tex. 2005), Smith v. Arthur Andersen LLP, 421 F.3d 989, 999-1000 (9th Cir. 2005) (all

holding same).

Indeed, the First Circuit specifically allows a judgment reduction provision that reallocates among other liable parties the percentage of liability attributable to an entity in bankruptcy.  Austin v. Raymark Indus., Inc., 841 F.2d 1184, 1187 (1st Cir. 1988); see also In re New York City Asbestos Litig., 572 N.Y.S.2d 1006 (Sup. Ct. 1991) (same); In re Joint E. & S. Districts Asbestos Litig., 124 F.R.D. 538 (E.D.N.Y. 1989) (same).

   3.    CP's Argument that this Court Should Refrain from Enforcement of the Sanction Order Because CP has Appealed the Sanction Order in Canada Lacks Merit and is Contrary to All Case Law on Point.

The pendency of an appeal of a foreign court's order is not a basis for a U.S. court to deny – or even delay – recognition or enforcement of the foreign court's order.   As the Bankruptcy Court in Gerova clearly explained:

> The Objectors also argue that recognition is not "ripe" because the Bermuda Court's Order winding-up Gerova is currently on appeal. Again, the Objectors cite no authority for the proposition that a foreign proceeding should not be recognized when the order commencing that proceeding is subject to appeal. That requirement cannot be found in the plain language of § 1517. Nor can it be found in § 1515(b)(1), which requires a petitioner to submit "a certified copy of the decision commencing such foreign proceeding" but does not require the decision to be final or non-appealable. Where Congress has elected not to impose such a requirement on recognition, there is no basis for the Court to do so here . . . The order of the Bermuda Court has been adequate to permit the Liquidators to take on their duties, and if the order is reversed on appeal, § 1518 requires that the Liquidators inform this Court accordingly.

482 B.R. 86, 94 (Bankr. S.D.N.Y. 2012) (citations omitted).

The Bankruptcy Court in Sino-Forest took the same view, where, like here, the objecting party had appealed the underlying order in Canada:

> The Objectors' appeal to the Court of Appeal for Ontario failed. While an additional motion for leave to appeal may be filed in the Supreme Court of Canada, this Court sees no reason to await the outcome of such at motion (if it is made) before ruling on the pending matter; the issues raised are not novel here or in Canada, as this Court's decision in Metcalfe demonstrates.

501 B.R. at 663 (emphasis added).

In <u>Rede</u>, the Bankruptcy Court for the Southern District of New York had the opportunity to consider the same question this Court must determine (i.e., whether to enforce a foreign plan confirmation order), including objections similar to CP's (e.g., objections by a party whose appeal of the foreign plan confirmation order was still pending in the foreign jurisdiction, Brazil). In disposing of the objection, the court found that

> [T]he Plan Enforcement Relief does not prevent the Ad Hoc Group from continuing to assert its rights under Brazilian law in the pending appeals of the decisions of the Brazilian Bankruptcy Court. In balancing the interests of the Rede Debtors against those of the Ad Hoc Group, the Court concludes that the Plan Enforcement Relief passes muster under section 1522(a) and is relief that is proper under section 1521.

<u>Rede</u>, 515 B.R. at 94.

The <u>Rede</u> court's reference to §§ 1521 and 1522(a) address CP's Objection head on. Section 1522(a) allows a court to recognize and enforce foreign orders only if the interests of the creditors and "other interested entities" are sufficiently protected. The provision also allows a court to modify or terminate any of the relief available upon recognition. In spite of the pending appeal of the underlying order in <u>Rede</u>, the court did not modify the relief requested in any way (e.g., by deferring enforcement until after the Brazilian appeal had been heard). <u>See</u> <u>id.</u>; <u>see also</u> <u>Multicanal</u>, 314 B.R. at 499 (recognizing and enforcing a foreign proceeding, without modification, while noting that appeals of the foreign order were still pending). CP's argument that "absurd results" or a parade of horribles will result from not waiting is baseless. This Court's order simply extends the reach of the Sanction Order to the U.S. If the effect of the Sanction Order is in suspense, so will be this Court's order.

4.      CP's Reliance on Vitro is Misplaced and Misleading

CP cites extensively to Vitro, a case that has been criticized and distinguished repeatedly, and which simply does not stand for the points of law that CP credits to that case.  Indeed, CP grossly mis-cites the decision.

Vitro does not stand for the proposition that a U.S. court must consider "whether the relief requested [in a recognition action] would otherwise be available in the United States." Vitro, 701 F.3d at 1057.[12]  As detailed above, such a holding would be contrary to every U.S. decision on international comity.  The Fifth Circuit's ultimate holding in Vitro was that the Bankruptcy Court did not abuse its discretion in denying recognition to a Mexican proceeding on numerous, non-exclusive grounds:

> [W]e hold that Vitro has not met its burden of showing that the relief requested under the Plan—a non-consensual discharge of non-debtor guarantors—is substantially in accordance with the circumstances that would warrant such relief in the United States.  In so holding, we stress the deferential standard under which we review the bankruptcy court's determination.  It is not our role to determine whether the above-summarized evidence would lead us to the same conclusion.  Our only task is to determine whether the bankruptcy court's decision was reasonable.

Id. at 1069.

Further, Vitro never actually reached the determination of whether the foreign court's orders would violate public policy, and stated so explicitly:

> Because we conclude that relief is not warranted under § 1507, however, and would also not be available under § 1521, we do not reach whether the [foreign] plan would be manifestly contrary to a fundamental public policy of the United States.[46]
>
>    n.46 For the same reason, we do not reach the Objecting Creditors' arguments that the Plan violates a fundamental public policy for infringing on the absolute

---

[12] Sino-Forest rejects Vitro's "three-step analysis" which includes an analysis of whether the relief requested would be available in the U.S. only if the relief requested does not fall under the enumerated provisions of § 1521.  As Sino-Forest found: "the Court believes that Vitro's three-step approach is unnecessary here because the Court already decided in Metcalfe that the relief sought is available under section 1507. Therefore, the Court declines to decide whether the 'any appropriate relief' language in section 1521 would also provide a basis for the relief." Sino-Forest, 501 B.R. at 664, n3.

> priority rule, the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et seq.,* or the interests of the United States in protecting creditors from so called "bad faith schemes."

Id. at 1070.

As other courts have noted, Vitro "was largely premised on an analysis of section 1507(b)(4) – 'distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title [11] ...'" and concluded "that the bankruptcy court did not abuse its discretion in finding that Vitro did not carry its burden under that subsection." Sino-Forest, 501 B.R. at 665. CP's Objection has nothing to say about the distribution of proceeds under the Sanction Order.

The Eleventh Circuit Court of Appeals noted that even Vitro's analysis of third-party releases was misplaced. Seaside Eng'g, 780 F.3d at 1077 (11th Cir. 2015) ("Although the Fifth Circuit in [Vitro], cited the Eleventh Circuit case of In re Jet Florida Systems, Inc., 883 F.2d 970 (1989), as being consistent with the minority view that non-consensual, non-debtor releases were prohibited by 11 U.S.C. § 524(e), the Fifth Circuit citation was misplaced. Our Jet Florida case did not involve a non-debtor release."). Vitro provides no basis whatsoever to overcome the avalanche of authority compelling recognition and enforcement of the Sanction Order; indeed, Vitro is irrelevant to this case.

**E.    CP's Counsel Should be Sanctioned Pursuant to 28 U.S.C. §1927.[13]**

As Justice Dumas has found, CP's "sole objective" is to "obtain a strategic negotiating advantage that would provide it with even more rights than it would have if the parties had simply decided to settle the class action out of court." He also found that to "accept the arguments presented by CP would undermine public confidence in the courts." Given that the

---

[13] The Trustee reserves all rights to pursue CP directly for sanctions or damages arising from CP's litigation tactics.

Sanction Order is entitled to comity, those findings and conclusions are entitled to *res judicata* and/or collateral estoppel effect in this Court.    In re Aerovias Nacionales de Colombia S.A. Avianca, 345 B.R. 120, 125 (Bankr. S.D.N.Y. 2006) ("a claim determination by a non-bankruptcy court in the United States would seemingly be conclusive as to the issues determined, for bankruptcy purposes, based on *res judicata* or collateral estoppel grounds . . . A similar result should ordinarily apply to determinations of foreign courts by virtue of principles of comity.") (internal citations omitted); Talisman Capital Alternative Inv. Fund, Ltd. v. Moutett (In re Moutett), 493 B.R. 640, 656 (Bankr. S.D. Fla. 2013) ("Because the Jamaican judgment should be given comity, then *res judicata* and collateral estoppel resolve all those claims addressed in or directly dependent on, the allegations resolved by the Jamaican trial court.").

Moreover, CP and its counsel were undoubtedly aware that the relief sought by the Monitor did not add to its burdens under the Sanction Order, given that CP is domiciled in Canada, and that, accordingly, CP was without standing to oppose the relief sought by the Motion.    Further, CP and its counsel are charged with knowledge of the overwhelming and unbroken precedent mandating recognition of CCAA proceedings and enforcement of plan sanction orders issued pursuant to the CCAA, precedent that makes CP's opposition patently frivolous.    CP has consistently mischaracterized the Sanction Order and the findings of Justice Dumas.    Clearly, the opposition to recognition and to enforcement of the Sanction Order is simply part of CP's cynical and extortionate attempt to delay these proceedings and the distribution of funds to the victims of the Derailment at all costs solely in the vain attempt to, at all costs, increase its perceived settlement leverage.    That CP has made itself the "last man standing" does not justify CP holding these proceedings, or the distributions to the victims, hostage.

"[A] bankruptcy court may impose sanctions pursuant to 28 U.S.C. §1927 if it finds that an attorney's actions are so completely without merit as to require the conclusion that they must have been taken for some improper purpose such as delay."  In re Residential Capital, LLC, 512 B.R. 179, 191 (Bankr. S.D.N.Y. 2014) (Court imposes sanctions for baseless litigation in violation of plan-based injunction and counsel's related delaying tactics).  See also In re Saint Vincent's Catholic Med. Ctr. of N.Y., 2014 WL 3545581 at *6 (S.D.N.Y. July 16, 2014) (sanctions under section 1927 are proper "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay," citing Oliveri, 675 F.3d at 1273); In re Prosser, 777 F.3d 154, 162 (3d Cir. 2015) (sanctions proper under section 1927 where "counsel knew or should have known" that claims were meritless, and "that the motive for filing the suit was for an improper purpose such as harassment."); In re Royal Manor Mgmt., Inc., 525 B.R. 338, 365 (6th Cir. B.A.P. 2015) ("The purpose of sanctions under §1927 is 'to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy.").

Justice Dumas' findings as to improper purpose are entitled to full respect in this Court. CP should not be allowed to put the parties to great expense to defend a settlement and a plan that does not, as a matter of law, prejudice CP in any way.  More important, CP should not be allowed to delay these proceedings and the distribution of settlement funds in an attempt to gain an untoward settlement advantage.  The fact that CP's attempts, as long as the Trustee serves, will be unsuccessful does not make the attempt any less contemptible or any less sanctionable. CP's counsel should be sanctioned and made to pay the costs of all parties, including the Trustee, in responding to its objections.

38

**F.      The U.S. Trustee's Motion to Continue the Petition and Motion Until Such Time as the Court can Rule on the Trustee's Plan is Unnecessary and Should be Denied.**

The U.S. Trustee requests that the Court continue the Petition and the Motion to the same date as the hearing on confirmation of the Trustee's plan in MMA's chapter 11 case.  This request is another way of suggesting that the Court should first determine whether the Sanction Order would be allowable in a plenary chapter 11 case (specifically MMA's).  In other words, the U.S. Trustee does not object to the Petition and the Motion at this time, but would prefer to wait and see if the Court will confirm the Trustee's plan, which contains substantially similar relief to the Sanction Order.  For the reasons set forth above, this is legally unnecessary, and not grounded in the law.  Indeed, this request ignores the need for comity and simply disrespects the vote that has already occurred under the CCAA and the Sanction Order itself.

As explained in detail above, in determining whether to grant comity to the Sanction Order, the correct inquiry is whether the order's terms are permitted under Canadian law, not whether the terms would be permitted under U.S. bankruptcy law.  This Court can enter an order enforcing the Sanction Order even if it could not, or would not, order such relief originally in MMA's chapter 11 case.  There is no nexus or inter-dependence.  There is no reason to delay this Court's ruling on the Petition and the Motion.  For this reason, the Trustee respectfully objects to the Motion to Continue.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the Trustee (a) supports the Petition and joins the Motion, (b) requests that this Court recognize and enforce the orders of the Québec Court, including the Sanction Order, and (c) requests that the Court deny the U.S. Trustee's Motion to Continue for the reasons stated above.  Additionally, the Trustee requests that the Court sanction

CP in an amount to be determined by the Court, but not less than the amount of attorney's fees

incurred by all parties, including the Trustee, in responding to CP's Objection.


Dated:  August 18, 2015                    ROBERT J. KEACH,
                                           CHAPTER 11 TRUSTEE OF MONTREAL
                                           MAINE & ATLANTIC RAILWAY, LTD.

                                           By his attorneys:

                                           */s/ Robert J. Keach*
                                           Robert J. Keach, Esq.
                                           Michael A. Siedband, Esq.
                                           BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
                                           100 Middle Street
                                           P.O. Box 9729
                                           Portland, ME 04104
                                           Telephone: (207) 774-1200
                                           Facsimile: (207) 774-1127
                                           E-mail: rkeach@bernsteinshur.com